344 So.2d 1060 (1977)
Elton Charles DUPRE
v.
STERLING PLATE GLASS & PAINT COMPANY, INC., et al.
No. 11167.
Court of Appeal of Louisiana, First Circuit.
March 21, 1977.
Rehearing Denied May 9, 1977.
*1061 Arthur Cobb, Baton Rouge, of counsel for plaintiff-appellee Elton Charles Dupre.
Boris F. Navratil, of Breazeale, Sachse & Wilson, Baton Rouge, of counsel for defendant-appellant Sterling Plate Glass & Paint Co., Inc.
Robert D. Hoover, Baton Rouge, of counsel for Standard Roofing Co., Inc. & U. S. Fidelity & Guaranty Complex.
William C. Kaufman, III, Baton Rouge, of counsel for defendant-appellant Southern Bldg., Inc. & American Ins. Co.
James E. Moore, Jr., Baton Rouge, of counsel for Alpano Aluminum Products.
Before LANDRY, EDWARDS and COLE, JJ.
*1062 COLE, Judge.
This is a suit for workmen's compensation weekly benefits, medical expenses, penalties, and attorney's fees filed by the plaintiff, Elton Charles Dupre, against his former employer, Sterling Plate Glass & Paint Company, Inc. (Sterling). This claim arises out of an accident which occurred on February 11, 1976, in which the plaintiff fell five stories from the new Our Lady of the Lake Hospital which was under construction at the time. Also named as defendants in plaintiff's suit were Southern Builders, Inc. (Southern), the general contractor on the project, and Southern's workmen's compensation carrier, The American Insurance Company (American).
Southern filed a third party demand based on La.R.S. 23:1063[1] for indemnity against Alpano Aluminum Products (Alpano) and against Sterling. Alpano, in turn, filed a third party demand against Sterling for indemnity. These claims were predicated on the contractual relationship between the companies. Southern awarded a subcontract for the window work to Alpano, a window manufacturer. Alpano, in turn, contracted with Sterling, the plaintiff's employer, to install the windows on the project.
Sterling and Southern also filed third party claims against Standard Roofing Company (Standard), another Southern subcontractor, claiming that at the time of the accident the plaintiff was the borrowed employee of Standard, thus making Standard liable, in whole or in part, to the plaintiff for workmen's compensation.
At the trial all parties stipulated to the plaintiff's disability. The trial court rendered judgment in favor of plaintiff and against the defendants, Sterling and Southern, in solido, for workmen's compensation benefits, less a credit for benefits already paid, plus reasonable and necessary medical expenses.
Judgment was further rendered against Sterling for a 12 percent penalty on medical expenses which were not timely paid and for attorney's fees.
Judgment was rendered in favor of Southern and American on their third party demand against Alpano and Sterling for full and complete indemnity for the amount of the judgment in favor of the plaintiff. Judgment was also rendered in favor of Alpano on its third party demand against Sterling for full indemnity for the amount of the judgment rendered against Alpano in favor of Southern and American.
The third party claims of Sterling, Southern and American against Standard were dismissed.
Two issues are presented by this appeal. (1) Was the plaintiff the borrowed employee of Standard at the time of the accident, thereby making Standard liable in whole or in part for the plaintiff's workmen's compensation claims? (2) Is plaintiff entitled to penalties and attorney's fees because of Sterling's delay in paying medical expenses?
The facts as to how the accident happened are basically undisputed. On February 11, 1976, the plaintiff and a coworker were engaged in preparing the fifth floor of the new Our Lady of the Lake Hospital for window installation. As they were returning to their jobs on the fifth floor from a coffee break, they noticed a man at the end of a fifth floor wing, subsequently identified as an employee for Standard, attempting to lower on a rope a section of pipe through a floor-to-ceiling opening which had not yet been enclosed by a glass panel that was to be installed. The Standard employee was having difficulty lowering the pipe because it was apparently lodged against the edge of the floor below. The plaintiff, while attempting to aid the Standard employee by kicking the pipe free, evidently lost his balance and grabbed the *1063 guard rail. The guard rail gave way and the plaintiff fell out of the building.
The only factual dispute concerns whether the Standard employee asked the plaintiff to assist him or whether the plaintiff voluntarily offered his assistance. However, as will be evident from our discussion below, this factual dispute has no bearing on the result reached herein.
Sterling, Southern and American appeal the decision of the trial court that the plaintiff was not a borrowed employee or employee "pro hac vice" of Standard at the time of the accident. To support their contention to the contrary, they cite Spanja v. Thibodaux Boiler Works, 2 So.2d 668 (La. App. Orleans Cir. 1941), and Dixon v. Herrin Transportation Company, 81 So.2d 159 (La.App. 2nd Cir. 1955). In these tort cases, the courts held that the plaintiffs' exclusive remedies against the defendants were in workmen's compensation, because at the time of the accident in question they were borrowed employees.
The term "borrowed employee" is not a magical term, the mere use of which creates liability under Louisiana workmen's compensation laws. A prerequisite to any action arising under Louisiana workmen's compensation law is the existence of an employee-employer relationship. La.R.S. 23:1021, et seq.; e. g., Lewis v. Bellow, 212 So.2d 540 (La.App. 3rd Cir. 1968); Brownfield v. Southern Amusement Company, 196 La. 74, 198 So. 656 (1940).
As a general rule, for such a relationship to exist there must be a contract of employment, either expressed or implied, whereby services are furnished in anticipation of compensation. St. Paul Fire and Marine Insurance Company v. Richard, 208 So.2d 35 (La.App. 3rd Cir. 1967).
In discussing the employment relationship, it is said:
"A person may become an employee within the meaning of the Workmen's Compensation Act if he is performing a service for another with the latter's consent and subject to his control or direction. No formal contract between the two is necessary, and there need be no specific agreement as to how much is to be done or how long the arrangement shall continue. Nor is it required that the amount or terms of payment be settled, so long as the circumstances fairly indicate that the services were not intended as a gratuity and both parties understood that payment was to be made therefor." (Malone, "Louisiana Workmen's Compensation," § 52, p. 53)
As noted in Benoit v. Hunt Tool Company, 219 La. 380, 53 So.2d 137 (1951), decisions throughout the country (and, we add, this state) involving questions of borrowed employees cannot be reconciled in many instances. Compare, for example, Rooney v. Overseas Railway, Inc., 173 La. 183, 136 So. 486 (1931), and Spanja v. Thibodaux Boiler Works, supra. A review of the jurisprudence illustrates that various criteria have been considered to determine where the "borrowed employee" doctrine is applicable. These criteria are applied in varying combinations and with varying emphasis. No fixed test exists to determine the existence of a borrowed employee relationship. However, certain factors have been given great weight in the determination of the existence of such a relationship.
The most widely accepted test cited for establishing an employer-employee relationship involves the right of control. Benoit v. Hunt Tool Company, supra; Ruiz v. Shell Oil Company, 413 F.2d 310 (5th Cir. 1969) (action arising under the Longshoremen and Harbor Workers Compensation Act). The right of control has been described to include the following factors: the right to select and discharge the employee, the right to supervise and direct his work, and the method by which it is done, and the manner in which the employee is paid. Berry Brothers General Contractors, Inc. v. Air Marine, Inc., 328 So.2d 771 (La.App. 1st Cir. 1976); St. Paul Fire and Marine Insurance Company v. Richard, supra; Alexander v. J. E. Hixson and Sons Funeral Home, 44 So.2d 487 (La.App. 1st Cir 1950).
Implicit in the right to control is the necessity that the lending employer relinquish *1064 its control over its employee to the borrowing employer and that he is performing work for the borrowing employer's business. Benoit v. Hunt Tool Company, supra; Berry Brothers General Contractors, Inc. v. Air Marine, Inc., supra. Additionally, the concept of the "borrowed employee" doctrine, by its terms, connotes an agreement of some type between the lender and the borrower, that the lender relinquished such control of the employee to the borrower, Ruiz v. Shell Oil Company, supra; Malone, § 57, pp. 61-66, pocket part, § 57, pp. 14-21.
In the Spanja case cited by appellants, the Court discussed at length the right of control in reaching their result. However, in Dixon v. Herrin, also cited by appellants, the Spanja case was cited for the proposition that since the plaintiff was not engaged in any work related to his regular employment, the conclusion was inescapable that he was a borrowed employee. This proposition is not only a misstatement of the Spanja case, but also a misstatement of the law.
We will not try to distinguish the cases cited by counsel on the basis of their facts. Because there is no general test for employment relationships, each case revolves on its own particular facts. To determine the applicability of the Workmen's Compensation Act, it is necessary to inquire into the nature of the relationship involved based on the facts of the particular case. Sones v. Mutual of Omaha Insurance Company, 272 So.2d 739 (La.App. 2nd Cir. 1972).
A review of the facts in this case demonstrates a lack of factors sufficient to justify an employment relationship. Standard exercised no power of control over the plaintiff herein, either in selecting, discharging, supervising or directing his work. They did not control the manner by which he was paid; nor did they intend to compensate him for his services. The assistance furnished Standard's employee by the plaintiff was in the nature of a gratuity or a courtesy extended and does not constitute an employment relationship.
Sterling never intended to relinquish control over the plaintiff, nor was any agreement, either express or implied, ever reached between the alleged lender (Sterling) or the alleged borrower (Standard) that Sterling would relinquish control over the plaintiff to Standard. As testified by Standard's supervisor at the site and uncontradicted by the appellants, the customary practice on construction sites when one employer needs help is to request assistance from one of the other employer's supervisors on the site.
Therefore, for the above reasons, we conclude that the trial court correctly dismissed the third party claims of Southern, Sterling and American against Standard, as the plaintiff was not Standard's borrowed employee at the time of the accident.
Sterling makes the additional contention that the trial court erred in awarding the plaintiff penalties and attorney's fees. At the time of trial, Sterling had paid all weekly compensation benefits and medical expenses due up until that time. Therefore, the only issue at trial was whether the plaintiff was due any penalties or attorney's fees for the untimely payment. The trial court awarded 12 percent of $6,997.78 in medical fees as penalties and $2,000 in attorney's fees to the plaintiff because of the untimely payment of the medical expenses by the employer.
La.R.S. 23:1201.2 provides:
"A. Any employer whose liability for claims arising under the provisions of this Chapter is not covered by insurance, shall pay the amount of any claim due under the provisions of this Chapter, within sixty days after receipt of written notice. Failure to make such payment within sixty days after receipt of notice, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the employer to a penalty, in addition to the amount of claim due, of 12% of the total amount of such claim, payable to the claimant, together with all reasonable attorney's fees for the prosecution and collection of such claim, or in the event a partial payment or tender has been made, 12% of the difference between *1065 the amount paid or tendered and the amount found to be due, and all reasonable attorney's fees for the prosecution and collection of such amount. Any such employer who at any time discontinues payment of claims due and arising under the provisions of this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the penalties set forth above, payable to the claimant, together with all reasonable attorney's fees for the prosecution and collection of such claims. The provisions of R.S. 23:1141 limiting the amount of attorney's fees shall not apply in cases wherein the employer is found liable for penalties and attorney's fees under the provisions of this Section.
"B. The notice required by the provisions of this Section may be given or made by any person claiming to be entitled to compensation, or by any one on his behalf, and shall contain the information and signature required by R.S. 23:1293 and shall be given as required by R.S. 23:1294. Added Acts 1958, No. 432, § 1."
Because the penalty provided by the statute is harsh, it should not be imposed where there is a good faith dispute as to the occurrence of the accident or its causal connection to the disability. In such cases the employer's refusal to pay is deemed to be in good faith and with just cause. Crooks v. Belden Corporation, 334 So.2d 725 (La.App. 3rd Cir. 1976); Vining v. Phoenix of Hartford Insurance Company, 256 So.2d 698 (La. App. 1st Cir. 1971).
To determine whether the employer's action in refusing to pay the claim was arbitrary, capricious or without probable cause within the meaning of § 1201.2, it is necessary to determine what information the employer used, or had available to it, upon which it based its actions. Gauthier v. Employers National Insurance Company, 316 So.2d 769 (La.App. 1st Cir. 1975).
In the instant case, the plaintiff's attorney testified concerning his efforts to collect both weekly benefits and medical expenses from Sterling. His testimony was uncontradicted. Shortly after the accident, on February 27, 1976, Sterling paid two medical expenses relating to the accident. This action indicated, at that time, knowledge of the accident and an apparent acceptance of responsibility for compensation claims.
Because the plaintiff had not received any weekly benefits or additional medical expense payments, he contacted his attorney on about March 1, 1976. On March 3, 1976, plaintiff's attorney, Mr. Cobb, called a Sterling officer. Sterling informed Cobb of the Ohio compensation scheme which is state-administered and pays $186 per week. Sterling told Cobb of its desire to have the plaintiff covered by the Ohio compensation program, because it had no workmen's compensation insurance. There was serious question, however, that plaintiff's injury was covered under the Ohio scheme. At this time Sterling agreed to begin to pay the plaintiff $85 per week plus medical expenses.
When no payment was forthcoming, on March 17, 1976, plaintiff filed suit and a preference setting was obtained for April 19, 1976. The filing of suit is the first written notice which meets the criteria established by § 1201.2. On March 25, 1976, Cobb again talked to Sterling. This conversation revealed that Sterling was concerned about the possibility of double payment to plaintiff should it commence payment and then the Ohio Bureau of Workmen's Compensation should also begin payment. Sterling agreed to pay $85 per week plus medical expenses, in return for which the plaintiff agreed to pass the hearing date and also agreed that he would reimburse Sterling for any double payment which might result. On April 5, 1976, the plaintiff received payment covering weekly benefits from February 11 to April 2. On April 20, payment was made for benefits from April 3 to 23. Subsequently, Sterling began to pay compensation benefits on a weekly basis.
As noted by the trial court, "According to the exhibits filed in the record, together with Cobb's testimony, it appears that it *1066 [Sterling] was furnished, either directly or by copy of transmittal letters to the Ohio Commission," from March 18, 1976, to March 29, 1976, a total of $6,997.78 in medical bills arising from the accident. Payment for these expenses was not received by the plaintiff until June 10, 1976, more than sixty days after notice of the claims. These medical expenses form the basis of the trial court's award for penalties and attorney's fees.
Sterling contends that the penalty provision of § 1201.2 applies only to the untimely payment of weekly compensation benefits and not to medical expenses. However, the statute covers "any claim due under the provisions of this Chapter." As correctly noted by the court below, this provision obviously includes medical expenses provided under § 1203 of the chapter. See Scott v. Hartford Accident & Indemnity Company, 302 So.2d 641 (La.App. 3rd Cir. 1974) (12 percent penalties paid on both weekly compensation benefits and medical expenses); Vining v. Phoenix of Hartford Insurance Company, supra (attorney's fees for arbitrary refusal to pay medical expenses).
Sterling additionally seems to suggest as justification for its refusal to pay benefits that it was a small, family-owned company and that the payment of such claims was coming from its cash outflow. However, financial difficulty or inability to pay does not justify nonpayment of compensation claims provided by law. Pennywell v. Crawford, 262 So.2d 830 (La.App. 2nd Cir. 1972).
It is suggested that the legal uncertainty of whether the plaintiff would be covered under Ohio's compensation scheme to which Sterling contributed, justifies Sterling's failure to pay the medical expenses. However, the trial court correctly pointed out:
"While it is true that there was some uncertainty whether the Ohio Commission would make the payments or not, this did not excuse Sterling in timely paying the bills, especially when it had an agreement with Dupre recognizing its right to reimbursement when and if the Ohio Commission commenced making payments. * * *"
In this case, there was no good faith dispute as to the occurrence of the accident or the causal connection between it and the disability. There is ample evidence to support the trial court's conclusion that Sterling's failure to pay the medical expenses within sixty days of notice thereof was arbitrary, capricious and without probable cause.
For the foregoing reasons, the judgment of the trial court is affirmed. The costs of these proceedings are to be assessed to Sterling.
AFFIRMED.
NOTES
[1] La.R.S. 23:1063 provides:

"A principal contractor, when sued by an employee of a subcontractor or his dependent, may call that contractor, or any intermediate contractor or contractors, as a codefendant, and the principal contractor shall be entitled to indemnity from his subcontractor for compensation payments paid by the principal contractor on account of an accidental injury to the employee of the subcontractor."