352 So.2d 1061 (1977)
Clarence Joseph VINCENT, Plaintiff-Appellee,
v.
RYDER ENTERPRISES, INC., et al., Defendants-Appellants.
No. 6164.
Court of Appeal of Louisiana, Third Circuit.
November 17, 1977.
Rehearings Denied December 14, 1977.
*1062 E. Gregory Voorhies, Jr., of Voorhies & Labbe, Lafayette, for defendant-appellant, Ryder Enterprises.
Dubuisson, Brinkhaus & Dauzat, by James G. Dubuisson, Opelousas, for defendant-appellant, Getty Oil Co.
Gary R. Steckler, Lafayette, for plaintiff-appellee.
Allen, Gooch & Bourgeois, by Arthur I. Robison, Lafayette, for defendant-appellee.
Before DOMENGEAUX, WATSON and GUIDRY, JJ.
GUIDRY, Judge.
Plaintiff, Clarence Joseph Vincent, brings this action seeking recovery for personal injuries received in an explosion at an Alabama well site, while acting in the course and scope of his employment with Stooksberry Tank Company, Inc. (hereafter referred to as Stooksberry). The following parties are made defendants:
(1) Getty Oil Company (hereafter referred to as Getty), the lessee of the well site where the explosion occurred. Plaintiff's allegations of negligence on the part of Getty include failure to provide plaintiff with a safe place to work and failure to warn plaintiff of a dangerous condition existing in the vicinity in which he was standing.
(2) Ryder Enterprises, Inc. (hereafter referred to as Ryder), an oil field contractor that was providing men and equipment to the well site in accordance with a service contract then existing between Getty and Ryder. Plaintiff alleges that the same acts of negligence enumerated above were also committed by Ryder and additionally that a welder employed by Ryder was performing welding operations in the vicinity of an oil tank, and as a result of said activity, a spark ignited certain vapors subsequently causing the explosion which severely injured plaintiff.
(3) Hartford Accident and Indemnity Company (hereafter referred to as Hartford), the liability insurer of Ryder.
Defendants, Ryder and Hartford, filed answer generally denying plaintiff's allegations. Additionally, Ryder and Hartford seek to escape liability to plaintiff by claiming *1063 that the welder who allegedly caused the accident was a borrowed employee and was working in the course and scope of his employment for Getty and/or Stooksberry.
Getty, in its answers, denies liability and alleges that plaintiff was guilty of contributory negligence. While maintaining that it is not liable to plaintiff, Getty contends in an amended answer that if liability is found to exist, then in accordance with the provisions of LSA-R.S. 23:1061, Getty is the "statutory employer" of plaintiff and thus plaintiff's remedy against Getty is limited by our Workmen's Compensation Law.
Getty also filed a third party demand against Ryder and Hartford seeking indemnity or contribution. Ryder and Hartford answered the demand denying liability to either plaintiff or Getty.
Liberty Mutual Insurance Company (hereafter referred to as Liberty), the workmen's compensation insurer of Stooksberry, intervened in the suit seeking recovery of certain amounts paid to plaintiff as workmen's compensation benefits.
The following stipulations were agreed to by the parties at the time of trial:
(1) At the time of the alleged accident, Liberty was the workmen's compensation insurer of Stooksberry, plaintiff's employer, and that as a result of the injuries to plaintiff during the course and scope of his employment, Liberty has paid certain benefits to plaintiff totalling $9,712.30.
(2) Liberty is entitled to be reimbursed for the above amounts out of any damage award that plaintiff might receive and Liberty is entitled to a credit for any future amounts owed by Liberty to plaintiff in accordance with the provisions of LSA-R.S. 23:1103.
(3) A judgment against Ryder is a judgment against Hartford up to the limits of the policy.
(4) The question of indemnity as between Ryder and Getty was to be decided by the trial judge.
Plaintiff requested that the case be tried before a jury. After trial on the merits, the jury found in favor of plaintiff and against both defendants, in solido, fixing the amount of plaintiff's damages at $45,000.00. Judgment was entered in favor of Liberty in the amount of $9,712.30 against plaintiff and both defendants and ordered that said sum be paid in preference out of the amount awarded to plaintiff. Credit was allowed Liberty for any future amounts owed insofar as the award to plaintiff exceeds the amount awarded to Liberty, in accordance with LSA-R.S. 23:1103. The third party demand filed by Getty against Ryder was dismissed with prejudice at Getty's cost.
Both defendants filed timely motions for a new trial. Although all of the motions were refused, the trial court was of the opinion that the jury verdict against Getty was in error and that Getty's defense under R.S. 23:1061 should have been sustained. However, the trial court felt that it would be more expeditious to refuse both motions for new trial and to urge this Court to correct the error on appeal.
Defendants Ryder and Getty have appealed, seeking reversal of the judgment holding them to be liable to plaintiff and in the alternative to have the amount of the judgment reduced as being excessive.
The issues presented are: (1) Was the welder employed by Ryder a "borrowed employee" of Getty and/or Stooksberry? (2) Is Getty entitled to limit its liability as the "statutory employer" of plaintiff under LSA-R.S. 23:1061? (3) Was the amount awarded by the jury excessive?
The facts giving rise to this litigation are not seriously disputed and may be summarized as follows:
Getty is engaged in the business of exploring for and producing oil and gas products and is the lessee of a well site in Alabama known as the Peter Klein location. As Getty does not have the equipment necessary to conduct its operations, it contracts the work out to various service companies. At the time of plaintiff's injury, both Ryder and Stooksberry were under contract to provide certain services to assist Getty in its operations at the Peter Klein location. Ryder *1064 is a service company, engaged in the business of furnishing men and materials to perform various construction work for other companies. Stooksberry is a well testing company which provides certain evaluation services which are conducted at the well site.
Plaintiff was employed by Stooksberry as a truck driver. He was dispatched by his employer to the Peter Klein location to deliver certain well testing equipment. At the time of plaintiff's injury, Ryder was furnishing equipment and a roustabout crew to the Peter Klein location in accordance with a service contract between Ryder and Getty. One of the Ryder employees present at the location was a welder, M. E. Blackard.
Plaintiff arrived at the Peter Klein location on February 21, 1975 and proceeded to unload his equipment. His truck was positioned about twenty feet away from two oil storage tanks. After the unloading had been completed, plaintiff remained in the immediate area and decided to check his lights for the return trip home. It was at this time that plaintiff was injured by explosions which occurred in two oil tanks that were adjacent to his truck.
Although the exact cause of the explosion was never precisely ascertained, the record supports a finding that it was caused when gas vapors escaping from one of the oil tanks came into contact with sparks created by nearby welding operations which were being conducted by one of the Ryder employees.

LIABILITY OF RYDER
On the day of the explosion, several Ryder employees were working at the Peter Klein location. Plaintiff alleges that the explosion was caused by the negligence of a welder employed by Ryder, M. E. Blackard. The two tanks in question each had a capacity of 500 barrels, with one of the tanks containing about 300 barrels of calcium chloride water. In order to permit the safe removal of poisonous gas vapors from the tanks, a four inch ventilation pipe running from the top of the tanks out to a flare pit was installed. A pilot light located at the flare pit permitted the vapors to be safely burned.
Mr. Blackard testified that he had been welding or burning on the four inch vent pipe two or three hours prior to the explosion. It later became necessary to shorten the vent pipe, so Blackard was summoned, by a member of the Ryder crew, from another location to cut about a foot off of the end of the pipe. Apparently, the pipe was not hooked up to the tanks earlier that day, but had been subsequently connected prior to Blackard's return to the area. In order to prevent an explosion from happening when welding or cutting around a vent pipe such as this, a device known as a "flame arrester" is placed in the pipe between the tank and the open end of the pipe. This device allows the gas vapors to escape from the tank out to the flare pit, but prevents flashback from backing up into the tanks. The flame arrester was part of Stooksberry's equipment. No flame arresters had been installed at the time of the explosion.
Ryder admits that the most logical explanation for the explosion is that a spark or flame created by Blackard's actions in cutting the vent pipe apparently ignited gas vapors which had accumulated in the vent pipe and tank. Ryder does not seriously argue against the jury's apparent finding of negligence on the part of Blackard but contends that it is not responsible for Blackard's actions at that time because he was the borrowed employee of either Getty or Stooksberry. Ryder asserts that Blackard was performing work in the interest of Getty and that the right of control over his actions rested in Getty. Ryder argues that the right of control is the key element in determining whether or not an individual is a borrowed employee of another, citing Pagitt Well Service, Inc. v. Sam Broussard, Inc., 293 So.2d 631 (La.App. 3rd Cir. 1974, writ refused).
In seeking to establish Getty's right to control the members of the Ryder crew, especially Blackard, able counsel for Ryder places much emphasis on the fact that Leroy Ardoin, the Ryder gang pusher, had left *1065 the location on the day prior to the explosion. Bill Watson was the Getty sector foreman in charge of the operations being conducted at the well site. In a conversation between Ardoin and Watson concerning Ardoin's impending absence, Watson allegedly told Ardoin, "Don't worry, I'll take care of the men. I used to push a crew myself. Don't worry, I know what to do." Ardoin testified that he had left no one in charge from the Ryder crew and that it was his understanding that Watson would be in charge of the crew in his absence.
Ryder contends that it was at this point that Ryder relinquished control and Getty assumed control of the crew. Ryder maintains that Blackard was performing the work of Getty and that the right of control over the Ryder crew had been assumed by Getty. Ryder points to the testimony of Watson that if he had become dissatisfied with the work of a welder, he could have removed him from the location as demonstrating the degree of control that Getty exercised over the Ryder crew.
Ryder also contends that Blackard was a borrowed employee of Stooksberry, pointing to the testimony of Watson that an employee of Stooksberry was going to supervise the Ryder crew in connecting the vent pipe to the tanks and had authority to direct and control the operations of those Ryder laborers that were at the location.
Plaintiff-appellee, on the other hand, argues that other elements in addition to the right to control must be considered in making a determination as to whether or not Blackard was a borrowed employee. Plaintiff points out that Ryder was doing its own work and furnishing its own crew and equipment. Able counsel for plaintiff also asserts that the manner in which the work was to be performed was governed by Ryder and points out that Ryder paid Blackard's salary and furnished the welding equipment that was being used by him. Plaintiff argues that Ryder has failed to meet the burden imposed by our jurisprudence to the effect that the general employer must establish by a preponderance of the evidence the termination of his right to control and the assumption of that right by the borrowing employer, citing Universal Engineers & Builders, Inc. v. Lafayette Steel Erector Corporation, 235 So.2d 612 (La.App. 3rd Cir. 1970). Finally, plaintiff points to certain provisions in the contract then in effect between Ryder and Getty which read in pertinent part as follows:
"(3) Contractor agrees to perform the work specified herein with due diligence according to Contractor's own method, Contractor being accountable to Getty Oil only for the completed job. All persons furnished by Contractor in the performance hereunder shall be considered servants or agents of Contractor and not of Getty Oil, and Contractor shall be responsible as the employer of such persons under any applicable workmen's compensation, old age benefits, or unemployment insurance statutes and will fully comply with the employer's obligation under any such statutes." (emphasis added)
As foresaid, the jury found judgment against Ryder, thus apparently rejecting its "borrowed employee" defense.
Whether a person is a "borrowed servant" is an issue of fact. LeBlanc v. Roy Young, Inc., 308 So.2d 443 (La.App. 3rd Cir. 1975); Nichols Construction Corporation v. Spell, 315 So.2d 801 (La.App. 1st Cir. 1975).
Various criteria have been employed by courts in determining whether or not an individual is a borrowed employee. Although no single test has emerged victorious over others, the "right to control" test appears to have been given a great deal of weight. Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (La.1951); McCutchen v. Fruge, 132 So.2d 917 (La.App. 3rd Cir. 1961); Pagitt Well Service, Inc. v. Sam Broussard, Inc., supra; Berry Brothers General Contractors, Inc. v. Air Marine, Inc., 328 So.2d 771 (La.App. 1st Cir. 1976); Highlands Insurance Co. v. L. J. Denny and Son, 328 So.2d 779 (La.App. 3rd Cir. 1976, writ refused); Dupre v. Sterling Plate Glass & Paint Company, Inc., 344 So.2d 1060 (La. App. 1st Cir. 1977).
In the recent Dupre case, supra, our brethren of the First Circuit stated:

*1066 "The most widely accepted test cited for establishing an employer-employee relationship involves the right of control. Benoit v. Hunt Tool Company, supra; Ruiz v. Shell Oil Company, 413 F.2d 310 (5th Cir. 1969) (action arising under the Longshoremen and Harbor Workers Compensation Act). The right of control has been described to include the following factors: the right to select and discharge the employee, the right to supervise and direct his work, and the method by which it is done, and the manner in which the employee is paid. (citations omitted)
Implicit in the right to control is the necessity that the lending employer relinquish its control over its employee to the borrowing employer and that he is performing work for the borrowing employer's business. Benoit v. Hunt Tool Company, supra; Berry Brothers General Contractors, Inc. v. Air Marine, Inc., supra. Additionally, the concept of the `borrowed employee' doctrine, by its terms, connotes an agreement of some type between the lender and the borrower, that the lender relinquished such control of the employee to the borrower. Ruiz v. Shell Oil Company, supra; Malone, § 57, pp. 61-66, pocket part, § 57, pp. 14-21."
In the leading case of Benoit v. Hunt Tool Co., supra, our Supreme Court was faced with a factual situation that was almost identical to the instant case. In that case, plaintiffs were injured by an exploding fuel tank. The explosion was caused by welding operations which were being conducted by a welder employed by defendant, Hunt Tool Company. Defendant sought to escape liability by claiming that the welder was a borrowed servant of plaintiff's employer, Morris & Meredith, Inc.
After an exhaustive review of the applicable jurisprudence, the Court rejected defendant's contention that the welder was a borrowed employee, noting that Hunt Tool Company paid the welder's salary, furnished his materials and welding equipment and had the right to discharge him for any cause. The court further noted that although the welders that were furnished by Hunt Tool Company were informed as to what welding they were to do by Morris & Meredith, the method of accomplishment of such work was entirely up to the welders themselves.
We are of the opinion that the jury's finding of fact that Blackard was not the borrowed employee of Getty or Stooksberry, but remained the employee of Ryder is amply supported by the record.
It is not disputed that Blackard was employed by Ryder. Getty was charged on an hourly basis for Blackard's welding services. These hours were tabulated by means of daily work tickets which were signed by a Getty foreman. Getty was billed for services performed by Ryder personnel on the basis of these tickets. We note that this arrangement is similar to the billing system that was used in the Benoit case, supra. The tools and equipment used by Blackard were owned and furnished by Ryder. In his deposition, Blackard testified that he considered a man in the Ryder crew to have been left "kind of halfway in charge" during Ardoin's absence. This was corroborated by the deposition of Mr. James Lamar Calcote, another Getty production foreman which was introduced at trial. Calcote testified that when the gang pusher was not present, there was usually a "leadman" in the gang to whom he would issue instructions.
Regarding the degree of control exercised by Getty over the method of Blackard's work, we note that although Getty personnel would tell Blackard what to weld, they wouldn't tell him how to weld. Calcote testified that all they (Getty personnel) do is supervise the work in an advisory capacity. Although it appears that a Getty foreman could remove a welder from the job site if he didn't like his work, he couldn't fire him from Ryder Construction Company.
We are of the opinion that the conversation between Ardoin and Watson concerning who would take care of the crew in Ardoin's absence did not have the effect of *1067 making the welder the borrowed employee of Getty. In this regard, we note that the explicit provisions of the contract then in effect between Ryder and Getty specifically provide that the workmen furnished by Ryder are to be considered the servants of Ryder and not of Getty. See Dugas v. Pelican Construction Co., Inc., 481 F.2d 773, certiorari denied, Union Oil Co. of Cal. v. Dugas, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550.
In Universal Engineers & Builders, Inc. v. Lafayette Steel Erector Corporation, supra, this state stated:
". . . there is a presumption that the general employer retains control of and remains liable for the negligent acts of his employee. If the general employer seeks to avoid liability on the ground that his employee is the `borrowed servant' of another, then the burden of proof rests upon the general employer to show that the relationship of master and servant which previously existed between the general employer and employee has been suspended, that a new such relationship has been created between the borrowing employer and that employee, and that such new relationship was in existence at the time the accident occurred."
Ryder has not successfully carried its burden of proof as set forth above. From our careful reading of the record, we conclude that Blackard was under the control Ryder and was performing the work of Ryder at the time of plaintiff's injury. Thus, we find that the jury was correct in its finding of liability on the part of Ryder.

LIABILITY OF GETTY
Three days prior to trial, with leave of the trial court, Getty filed an amended and supplemental answer to plaintiff's petition. While maintaining that it is not liable to plaintiff, the answer states that in the event that liability is found, plaintiff's remedy against Getty is limited to his rights and remedies in workmen's compensation, as Getty is the "statutory employer" of plaintiff under LSA-R.S. 23:1061. In the alternative, the answer alleges that Getty, Ryder and Stooksberry were all independent contractors in relationship to each other and as a result, Getty is not responsible for the negligence of Ryder or Stooksberry or any of their officers, agents or employees.
Able counsel for plaintiff, in his brief before this court, complains that neither he nor counsel for Liberty (the intervenor) was served with a copy of this amended answer and had no knowledge that it had been signed by the trial court prior to the commencement of the trial. In this latter regard, we note that counsel for plaintiff did not move for a continuance and made no objection to the amended answer until the close of trial after the case had been submitted to the jury. LSA-C.C.P. Article 1151 clearly allows the filing of an amended answer at any time with leave of the trial court. LSA-C.C.P. Article 1154 provides that when issues not raised by the pleadings are tried without objection by the parties, the pleadings shall be deemed amended to encompass such issues.
If counsel for plaintiff felt prejudiced by the late filing of the amended answer, he could have sought a continuance and/or objected to the introduction of the evidence at the time it was offered. He did not do so, and his objection at the close of trial comes too late. The defense raised by Getty's amended answer was properly before the trial court.
In seeking to limit its liability to plaintiff, Getty relies on the provisions of LSA-R.S. 23:1061 which provides in pertinent part as follows:
"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which *1068 he would have been liable to pay if the employee had been immediately employed by him. . . ."
In his written reasons for judgment denying Getty's motion for a new trial the trial judge made the following statements:
"On the Section 6 defense, the Court felt to the contrary. The Court felt the decision on this question is patently and clearly in error and that Getty should have Judgment. . . .
The Court heard oral argument on all of the above, and has concluded that it is more expeditious to refuse both Motions for New Trial, and urge the Appellate Court to adopt this Court's Reasons upon appeal.
Accordingly, the Court urges the Appellate Court to sustain the Section 6 defense as being the considered Judgment of this Court."
Able counsel for plaintiff contends that Stooksberry was not engaged in any work activity that is a part of the trade, business, or occupation of Getty. Succinctly put, he advances the argument that since Getty is not in the business of testing wells, then well testing is not a part of Getty's trade, business, or occupation.
We find no merit in this contention. In Foster v. Western Electric Company, Inc., 258 So.2d 153 (La.App. 2nd Cir. 1972) the court stated:
"A contractor's activity has been held to be part of the principal's trade, business, or occupation where the activity is a `normal and integral' part of the principal's business. (citations omitted)
In Arnold v. Shell Oil Company (5th Cir. 1969), 419 F.2d 43, 50, the court, after a detailed discussion of the Louisiana cases, stated, `the test seems . . . (to be) whether the employer would have to hire some workers of its own to perform the activity if it were not performed by the independent contractor; in other words, whether the activity was essential to the employer's business.' The term `essential' was also mentioned in Stansbury and Meche, supra." (emphasis in original)
It cannot be realistically contended that Stooksberry was not engaged in the trade, business or occupation of Getty at the time of plaintiff's injury. It is undisputed that Getty was engaged in the business of exploring for and producing oil and gas products. Stooksberry is engaged in the business of testing wells. Uncontradicted evidence adduced at trial is to the effect that well testing is a necessary and integral part of Getty's business. It is also uncontested that plaintiff was acting in the course and scope of his employment at the time of his injury.
Under Louisiana jurisprudence, for a principal to be a statutory employer of a subcontractor's employees, the latter's employees must be engaged in an activity which is essential to the principal's business. Liles v. Riblet Products of Louisiana, Inc., D.C.1973, 363 F.Supp. 358, affirmed 5 Cir., 509 F.2d 804, rehearing denied 5 Cir., 514 F.2d 721. Our research has disclosed the case of Jones v. Louisiana Oil Refining Corporation, 1925, 3 La.App. 85, holding that an employee of one engaged to haul material for an oil company is doing work connected with and part of the business of producing oil. In the instant case, plaintiff was engaged in hauling well testing equipment to Getty's well site. This activity is essential to the business of exploring for and producing oil and gas products.
There are four essential elements which must be present in order for R.S. 23:1061 to be applicable:
(1) The relationship of principal-contractor (as distinguished from another type of relationship, i. e., vendor-vendee) must exist.
(2) There must be a contract between the principal and contractor for the execution by the contractor of the whole or any part of the work being undertaken by the principal.
(3) The "work" which is the subject of the contract must be part of the principal's trade, business or occupation.
*1069 (4) The injured employee must be engaged in the execution of the "work" as described above.
LSA-R.S. 23:1061; Broussard v. Heebe's Bakery, Inc., 263 La. 561, 268 So.2d 656 (1972); Liles v. Riblet Products of Louisiana, Inc., supra.
All of the required elements are present in the instant case. The record establishes a principal-contractor relationship and reflects the existence of a contract between Getty and Stooksberry whereby Stooksberry would engage in the activity of well testing. Well testing is an essential and integral part of Getty's business, and thus is a part of Getty's trade, business, or occupation. Plaintiff was employed in the execution of work that is essential to Getty's business. It is necessary to bring certain well testing devices to the drill site. Plaintiff was engaged in the transportation of such devices at the time of his injury. We conclude that the transportation of well testing equipment to the well site is a part of Getty's trade, business, or occupation.
Able counsel for Liberty, in his brief before this court, refers us to the recent case of Cain v. Witco Chemical Corporation, 341 So.2d 1220 (La.App. 1st Cir. 1977, writs refused La., 343 So.2d 1078, 1079, no error of law). In that case, a truck driver waiting to unload his cargo of acid at defendant's place of business was severely injured when a pipe that was being used in unloading acid from another truck suddenly burst. Defendant sought to limit plaintiff to a remedy in workmen's compensation, contending that the work of plaintiff was part of the trade, business or occupation of defendant. The court rejected this argument, stating:
"The record clearly establishes that the hauling of acid was a function which Witco required for the successful operation of its business but was also one which they did not desire to become involved in."
This decision by our esteemed brethren of the First Circuit appears to conflict with the plain terms of LSA-R.S. 23:1061 and the jurisprudence interpreting same and for that reason we decline to follow same. Particularly, we find ourselves in disagreement with the above quoted language which appears to hold that the applicability of LSA-R.S. 23:1061 can be defeated simply by showing that the principal employer did not wish to become involved in a certain activity although that activity may be an integral part of the principal's trade, business or occupation. Although we observe that writs were denied in Cain, supra, we do not feel compelled to follow such decision. Our Supreme Court has held many times that their refusal to grant writs, although persuasive, does not establish a legal precedent since the Supreme Court is not bound by its refusal of writs, to adopt law expressed in appellate court opinions. Garlington v. Kingsley, 289 So.2d 88 (La.1973); Colonial Pipeline Company v. Agerton, 289 So.2d 93 (La.1974).
We agree with the conclusion of the trial judge that the jury verdict holding Getty liable to plaintiff in tort is manifestly erroneous and that Getty's "statutory employer" defense should be sustained.
Able counsel for plaintiff-appellee argues that a statutory employer should not be granted tort immunity, relying on Justice Tate's concurring opinion in Broussard v. Heebe's Bakery, Inc., supra. In that case, R.S. 23:1061 was found to be inapplicable because of the absence of a principal-contractor relationship. Even conceding, arguendo, that the Court's decision in Broussard, supra, that R.S. 23:1061 grants tort immunity to the principal was dictum, we find that the rule expressed in the majority opinion reflects clearly established law. Benoit v. Hunt Tool Co., supra; Wofford v. Dow, 335 So.2d 536 (La.App. 1st Cir. 1976); Pullig v. Shreveport Packing Company, Inc. of Kansas, et al, 342 So.2d 1217 (La.App. 2nd Cir. 1977); Alexander v. State Through Dept. of Highways, 347 So.2d 1249 (La.App. 1st Cir. 1977); Jones v. Francis Romero, Inc., 345 So.2d 1286 (La.App. 3rd Cir. 1977) and cases cited therein.

*1070 QUANTUM
Both Ryder and Getty contend that the award of $45,000.00 to plaintiff is grossly excessive, and urge this court to reduce plaintiff's award to $25,000.00. This issue is moot as it regards the liability of Getty in light of our holding that Getty's liability to plaintiff is limited to workmen's compensation. However, this issue is still properly before this court insofar as it affects the liability of Ryder.
Plaintiff suffered painful second degree burns on his face, hands and legs. These burned areas comprised a total of 16.5 percent of his body. His injuries caused plaintiff a great deal of humiliation and mental anguish. He would not allow members of his family to visit him in the hospital until ten days after the accident.
At trial, plaintiff exhibited his hands to the jury and described the extent of his pain and suffering. He described the course of treatment that he received while in the hospital, which included daily whirlpool baths and changes of his bandages. Dead flesh was cut from his hands with scissors. Every morning, his face was shaved with a special blade to prevent infection and the flesh would come off with the blade. He was unable to use his hands to feed himself and required assistance when he went to the bathroom. Photographs taken of plaintiff when he was in the hospital were shown to the jury.
After approximately two and a half weeks, plaintiff was discharged from the hospital. When he returned home, his wife continued to provide the same care for him as he was receiving in the hospital. The pain in his hands required him to sleep with both of his hands on pillows.
Plaintiff received treatment at the Louisiana Rehabilitation Center in Lafayette, Louisiana, for a period of approximately ten months. Plaintiff's hands were very sensitive to the sun, which necessitated his wearing special gloves whenever he went into the sunlight. He was also required to wear a special glove when visiting friends, to prevent infection. Plaintiff testified that he was unable to go to ball games with his children, because this involved exposure to the sun.
Skin grafts, performed prior to trial by a plastic surgeon, had not corrected the condition of his hands. Plaintiff's hands have discolored areas on them because of the burns. The cost of future cosmetic surgery to correct this condition is approximately $4,000.00. In any event, plaintiff's hands will never look the way they did before the accident.
At trial, plaintiff testified that he still has pain in his hands. He can't put any pressure on his hands or hold anything steady. He testified that the pain in his hands bothers him whenever he drives his truck.
In addition to his burn injuries, plaintiff also suffered damage to his ears in the explosion. He has suffered a high frequency hearing loss in both ears, and constantly hears a noise in his ears.
Plaintiff also testified that he received injuries to his teeth and gums when he clenched his jaw in pain. He also complains of injuries to his leg and elbow as a result of being struck by pieces of metal in the explosion.
In considering the issue of quantum before us we must bear in mind the case of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977) wherein our Supreme Court stated:
"We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. (citations omitted)
Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court." (citations omitted)
Considering the evidence in the record as to the extent of plaintiff's injuries, we conclude *1071 that the trier of fact did not abuse its "much discretion" in granting plaintiff an award of $45,000.00.
For the above and foregoing reasons the judgment of the trial court, insofar as it decrees Getty's liability in tort to plaintiff, is reversed and set aside and it is now ordered that plaintiff's suit against Getty Oil Company is ordered dismissed with prejudice. In all other respects the judgment appealed from is affirmed. Ryder and Hartford are cast for all costs at the trial level and on appeal.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.