575 F.2d 1140
 George E. BLANCHARD, Plaintiff-Appellant, Cross-Appellee,
v.
ENGINE AND GAS COMPRESSOR SERVICES, INC. and Gulf Oil
Corporation, Defendants-Appellees,
v.
COMMERCIAL UNION INSURANCE COMPANY, Intervenor-Appellee,
Cross-Appellant.
 No. 75-4216.
 United States Court of Appeals,
Fifth Circuit.
 June 30, 1978.
 
 Harry R. Allen, Gulfport, Miss., Walter E. Ross, Jr., Biloxi, Miss., for plaintiff-appellant, cross-appellee.
 George E. Morse, Gulfport, Miss., for Gulf Oil Corp.
 Thomas L. Stennis, II, Gulfport, Miss., H. Edward Weidlich, Jr., Felicien P. Lozes, New Orleans, La., for Commercial Union Ins. Co.
 Sherman L. Muths, Jr., Gulfport, Miss., Claude D. Vasser, New Orleans, La., for Engine and Gas Compressor Services, Inc.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, Chief Judge, GEWIN and TJOFLAT, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 This appeal presents two issues that have long troubled appellate court waters. First, we must decide if a new creature of the deep, never before seen by this Court, is a Jones Act[1] vessel, and second, we are asked to grapple again with the problem of what is a statutory employee under Louisiana workmen's compensation law. On the first issue, feeling at home in maritime waters, we hold that, whatever the creature is, it is not a vessel, and with no vessel, there is no seaman. On the second issue, however, we must ask for guidance from our brethren on the Louisiana Supreme Court.
 
 A Compressor In The Delta
 
 2
 George E. Blanchard, a mechanic employed by Engine and Gas Compression Service, Inc. (Engine and Gas), was injured at the West Bay Gas Compression Station owned by Gulf Oil Corporation (Gulf). Engine and Gas had a contract with Gulf to repair the compressors at the Station, which is located in shallow waters near a marshy area in the Mississippi River delta about thirty minutes by crewboat from Venice, Louisiana. The facility included four individual compressor buildings that housed a total of sixteen compressors. Two of these buildings, known as the Ingersoll Rand Station and the Cooper Station, stood on pilings that were driven into the ground. The other two buildings were mounted on submerged barges. The Clark Station was on a steel barge, and the Cooper Bessemer No. 6 Station was on a concrete barge. All four structures were grouped closely together and connected with pipes, walkways, and wiring.
 
 
 3
 Blanchard and Pollard Lee, another employee of Engine and Gas, were repairing a compressor in the Ingersoll Rand Station when the appellant was injured. Blanchard testified that he asked the Gulf supervisor if they could drain the oil from the compressor engine crankcase before doing any work, but the supervisor refused. As a result, Blanchard became covered with oil, and he slipped and injured his back when a 150-pound compressor bearing cap fell on him as he was trying to replace it. After a rest, Blanchard finished the work, but subsequently, his back problems grew worse. He was unable to return to work for over eight months. Eventually, he had lumbar disc surgery and suffered a permanent partial disability.[2]
 
 
 4
 Blanchard filed suit for damages against his employer and Gulf under the Jones Act and general maritime law, but the District Court dismissed the claim on the defendant's summary judgment motion. A third party tort suit against Gulf on diversity grounds then proceeded to trial. The lower court, however, sustained a motion for a directed verdict against the plaintiff because Blanchard was a statutory employee of Gulf under the Louisiana Workmen's Compensation Act, and therefore, his right to recovery was limited to workmen's compensation. Blanchard appeals both the summary judgment and the directed verdict.
 
 
 5
 A Capital Ship For An Ocean Trip?
 
 
 6
 Even though Blanchard was injured in the Ingersoll Rand Station that was mounted on fixed pilings, he contends that he was a Jones Act seaman because he also did substantial work in the two buildings mounted on submerged barges, the Clark and the Cooper Bessemer No. 6 Stations. It is arguable whether Blanchard performed enough work aboard the submerged barges to be considered a seaman, see Ross v. Mobil Oil Corp., 5 Cir., 1973, 474 F.2d 989; Keener v. Transworld Drilling Co., 5 Cir., 1972, 468 F.2d 729, 732, 1973 A.M.C. 63, 66, but we need not reach this issue since we believe that the buildings mounted on virtually permanently sunken barges are not Jones Act vessels.
 
 
 7
 In determining what is a vessel, we consider the purpose for which the craft is constructed and the business in which it is engaged. The Robert W. Parsons, 1903, 191 U.S. 17, 30, 24 S.Ct. 8, 12, 48 L.Ed. 73, 78; Hicks v. Ocean Drilling and Exploration Co., 5 Cir., 1975, 512 F.2d 817, 823, 1975 A.M.C. 1378, 1385, cert. denied, 1976, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639; Cook v. Belden Concrete Products, Inc., 5 Cir., 1973, 472 F.2d 999, 1001, 1973 A.M.C. 285, 288, cert. denied, 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116. Strange looking, special purpose craft for the oil and gas business, far different from traditional seafaring ships, have sometimes met these criteria.
 
 
 8
 For example, in Offshore Co. v. Robinson, 5 Cir., 1959, 266 F.2d 769, 1959 A.M.C. 2049, a drilling barge with retractable legs that dropped to the ocean floor when drilling for oil was held to be a vessel. The Robinson barge did not have engines of its own, but it had a raked bow and carried navigation lights, bits, anchors, bilge pumps, and cranes. The craft also had lifesaving gear approved by the Coast Guard, including six life rafts, as well as living quarters for a crew that remained on board the barge when it was towed to a different well location.
 
 
 9
 In Producers Drilling Co. v. Gray, 5 Cir., 1966, 361 F.2d 432, 1966 A.M.C. 1260, we held a submersible drilling barge to be a Jones Act vessel. A tug would tow the barge to a well location where it would submerge itself "with its own gear" for drilling and then rise to the surface "by means of its own gear and devices to be moved to another location." 361 F.2d at 433, 1960 A.M.C. at 1261. Along with the drilling equipment, the barge carried navigation instruments, lights, pumps, and the usual mooring lines and stanchions found on oceangoing vessels.[3]
 
 
 10
 More recently, a submersible oil storage facility, which became known as the Round Barge, was held to be a vessel in Hicks v. Ocean Drilling and Exploration Co., 5 Cir., 1975, 512 F.2d 817, 1975 A.M.C. 1378. This facility consisted of six interconnected oil storage tanks that were submerged in the waters of the Gulf and were topped with a superstructure approximately forty feet above the cylindrical tanks. The Round Barge, which had its own galley and crew quarters, was towed into position and submerged by flooding two tanks. Rock ballast was also used to try to keep the facility at the bottom of the Gulf. Like the submersible drilling rigs, however, the oil storage facility "was designed and constructed so that it could be raised for scraping and repair, and could be moved to another site for storage of oil. Consideration had been given to moving it to a different location in the Gulf." 512 F.2d at 820, 1975 A.M.C. at 1380.
 
 
 11
 The oil storage facility also was connected by flowlines and a catwalk to a fixed offshore platform, but the Court emphasized that these attachments did not secure one structure to the other. Indeed, it was obvious from the circumstances of the accident that injured the plaintiff that the Round Barge was not securely fastened to the fixed platform or the bottom of the Gulf. After removing the oil from some of the storage tanks, a crew member operated the pumps that removed the salt water ballast from one of the underwater tanks. This caused the entire facility to shake, tilt, and refloat on one side injuring the plaintiff.
 
 
 12
 In contrast to these vessels, we believe, in this case that the purpose and business of the compressor buildings mounted on submersible barges had nothing to do with being Jones Act vessels. It simply was cheaper to build these structures on shore and float them into position, rather than build them on site at the West Bay Station, which was how the two buildings on pilings were constructed.
 
 
 13
 Gulf, moreover, did not intend to move these structures on a regular basis, as is done with submersible drilling rigs. Indeed, the Clark Station that rested on a steel barge had not been moved since it was installed in 1952. Gulf personnel now doubted that it could be refloated after over twenty years of corrosion. The Cooper Bessemer No. 6 Station had been moved from another site,[4] but it is clear from the manner in which it was secured in position no one intended for it to move on a regular basis. The site for the barge was dredged; then Gulf laid a shell bed to strengthen the foundation. After the barge was submerged, piling clusters were driven around the corners of the barge, and steel cables were fastened to the pilings and the barge to hold it in place. Thus, the manner in which this barge was attached to the bottom of the shallow Gulf waters distinguishes it from the submersible oil storage tanks in Hicks.
 
 
 14
 As another indication of the permanent nature of the submerged barges, they did not carry navigation lights or equipment, lifeboats or any lifesaving gear, nor were they registered with the Coast Guard as vessels. Unlike the barges in Gray and Hicks, furthermore, these barges did not have crew quarters or their own bilge pumps to remove water if they were raised. The barges did not even have a raked bow for ease in transport. In fact, Gulf emphasized that they could be moved, if at all, only under the most favorable weather conditions.
 
 
 15
 In sum, we believe "(m)ere flotation on water does not constitute a structure a 'vessel' . . . ." Cook v. Belden Concrete Products, Inc., 5 Cir., 1973, 472 F.2d 999, 1001, 1973 A.M.C. 285, 286-87, cert. denied, 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116, quoting, Atkins v. Greenville Shipbuilding Corp., 5 Cir., 1969, 411 F.2d 279, 1969 A.M.C. 1728, cert. denied, 396 U.S. 846, 90 S.Ct. 105, 24 L.Ed.2d 96. The purpose and business of the Clark and Cooper Bessemer No. 6 Stations were as fixed platforms, not Jones Act ships. Thus, the summary judgment on the seaman's claim was correct.[5]
 
 Divining Louisiana Law
 
 16
 In granting a directed verdict for Gulf on the claim in diversity, the District Court held that Blanchard was barred from recovery because he was a statutory employee of Gulf under the Workmen's Compensation Act. La.Rev.Stat.Ann. § 23:1061 (West).[6] We weigh the sufficiency of the evidence on a directed verdict in a diversity case under a federal standard. Boeing Co. v. Shipman, 5 Cir., 1969, 411 F.2d 365, 368 (en banc). Before applying the federal test, however, we must, being Erie bound, have a clear idea of Louisiana law on statutory employees. But despite briefs, oral argument, and our own research, which consists of reading the many, many cases by us and the many more by Louisiana appellate courts trying to fathom what is "part of (an employer's) trade, business, or occupation," we are still in doubt about the underlying state law.
 
 
 17
 In Arnold v. Shell Oil Co., 5 Cir., 1969, 419 F.2d 43, Judge Wisdom for us perceived that the guiding light in Louisiana on defining a statutory employee was whether the employee was engaged in any activity "essential to the business" of the principal employer. Six years later, however, through Judge Ainsworth in Freeman v. Chevron Oil Co., 5 Cir., 1975, 517 F.2d 201, we concluded that this test had been changed by an intervening Louisiana court decision.
 
 
 18
 This conclusion was based on the post-Arnold Louisiana Supreme Court opinion of Reeves v. Louisiana & Arkansas Ry., La., 1973, 282 So.2d 503, in which a construction employee, who was injured in building a new coking unit at a Humble oil refinery, was held not to be a statutory employee of Humble:
 
 
 19
 Thus, it was not Humble's business practice to engage in new construction of this type and magnitude, nor does the record support a conclusion that this type work was customarily done by Humble or other employers similarly situated. The record does not support a conclusion that Humble is a statutory employer. See Thibodaux v. Sun Oil Co., 218 La. 453, 49 So.2d 852 (1950) and Horrell v. Gulf & Valley Cotton Oil Co., Inc., 15 La.App. 603, 131 So. 709 (1930).
 
 
 20
 Id. at 508. In Judge Ainsworth's words, the Reeves decision was explained as follows:
 
 
 21
 Significantly, the factor of whether construction of a coking unit is essential to Humble's business was given no express consideration by the Louisiana Supreme Court. The determining factors in Reeves in establishing that the work of the contractor was not part of the business of the principal appear to be that the construction was new and that Humble produced no proof that it did, as a matter of practice, or could if necessary, perform the activity of the contractor. In short, the construction of a coking plant was not part of the trade, business or occupation of an oil refinery.
 
 
 22
 517 F.2d at 208.
 
 
 23
 In Freeman, the "essential to the business" test was criticized, in particular, because an employer "does not contract for work by independent contractors . . . unless it is helpful and necessary to the operation of its business enterprise." Id. at 206. Professor Larson in his treatise agrees:
 
 
 24
 From these cases it will be readily seen that the test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in that business, normally carried on through employees rather than independent contractors.
 
 
 25
 A. Larson, The Law of Workmen's Compensation § 49.12, at 9-23 to 9-24 (1973).
 
 
 26
 The case before us is a good example of the problem expressed in Freeman and Larson's treatise. Blanchard contends that he was hired only as a specialist to make major repairs; therefore, he was not a statutory employee. See Horrell v. Gulf & Valley Cotton Oil Co., Inc., 1930, 15 La.App. 603, 131 So. 709; W. Malone, Louisiana Workmen's Compensation Law and Practice § 125, at 152-53 (1951). But in every case it would appear that the repair of vital machinery is essential to the success of a business. And a major repair would be even more essential. Indeed, this is what Gulf argues. This line of reasoning, however, would eliminate the major repair exception for statutory employees, and we doubt this is the intended course of Louisiana law. See, e. g., Brown v. Kaiser Aluminum and Chemical Corp., La.App., 1973, 289 So.2d 524, 525.[7]
 
 
 27
 In view of the criticism of the "essential to the business" test in Freeman and implicitly in Reeves, presumably the lower courts in Louisiana would gladly throw off its yoke. But our research indicates otherwise. Counsel at oral argument directed our attention to Cain v. Witco Chem. Corp., La.App., 1977, 341 So.2d 1220, in which a statutory employee defense was rejected simply because the company "did not desire to become involved in" the activity in which the plaintiff was injured. Another appellate court, however, severely criticized Cain and refused to follow its holding that the statutory employer defense could be defeated so easily. Vincent v. Ryder Enterprises, Inc., La.App., 1977, 352 So.2d 1061, 1069.[8] This court, moreover, stated that the test is whether the employee is "engaged in an activity which is essential to the principal's business." Id. at 1068. Earlier the same appellate court approved a jury charge with a definition of a statutory employee that included the "essential to the business" language. Jones v. Francis Romero, Inc., La.App., 1977, 345 So.2d 1286, 1289.
 
 
 28
 In light of our own doubts and this Court's apparently unsuccessful efforts in the past to articulate standards for guidance of federal trial judges and, equally important, counsel who must struggle with this enigma wrapped in a mystery, we are reluctant to speculate again on what is a statutory employee in Louisiana. And the conflict now in the Louisiana appellate courts forces us to call for guidance, lest we add to the quandary ourselves by burying the "essential to the business" test without a proper funeral by the chief undertaker the Louisiana Supreme Court. We take advantage, therefore, of the certification procedure in Louisiana to ask for directions from its highest court. La.Rev.Stat.Ann. § 13:72.1 (West). See, e. g., Ward v. State Farm Mutual Ins. Co., 5 Cir., 1976, 539 F.2d 1044.[9]
 
 
 29
 Following our usual practice, e. g., H. S. Equities, Inc. v. Hartford Acc. & Indem. Co., 5 Cir., 1975, 512 F.2d 1277; West v. Caterpillar Tractor Co., Inc., 5 Cir., 1974, 504 F.2d 967, by directive from the Clerk, counsel for the parties will be requested to submit a proposed statement of the facts and proposed certificate of issues for decision by the Supreme Court of Louisiana. Although we have doubts about the demise of the "essential to the business" test, we emphasize again that counsel are not limited to this specific concern in the preparation of state law issues which will guide our decision. Neither is the Louisiana Supreme Court restricted in framing its answers, and we welcome answers to corollary questions thought by it to be significant.[10]
 
 
 30
 On receipt of counsel's proposed statement of the facts and issues to be certified, we will issue the formal certification transmitting the entire record in this case, the Court's opinion, and all the papers and briefs to the Louisiana Supreme Court.
 
 
 31
 AFFIRMED IN PART and CERTIFIED.
 
 
 
 [1]
 46 U.S.C.A. § 688
 
 
 [2]
 Blanchard received workmen's compensation benefits from Commercial Union Insurance Company, the insurance carrier for Engine and Gas. Commercial Union has now intervened in this case to seek reimbursement from Gulf out of any judgment in favor of Blanchard
 
 
 [3]
 Similarly described drilling barges have been held to be Jones Act vessels in Rogers v. Gracey-Hellums Corp., E.D.La., 1970, 331 F.Supp. 1287, 1288, 1971 A.M.C. 955, 956 (Rubin, D. J.) (barge was never "attached to the bottom by rip-rap, shells or the like"), aff'd, 5 Cir., 1971, 442 F.2d 1196 (per curiam); Loftis v. Southeastern Drilling, Inc., E.D.La., 1967, 43 F.R.D. 32, 33, 1969 A.M.C. 729, 730 ("(the barge) has eating accommodations and sleeping quarters, carries lifesaving and firefighting equipment and is equipped with anchors"); Daughdrill v. Diamond "M" Drilling Co., W.D.La., 1969, 305 F.Supp. 836, 839; Guilbeau v. Falcon Seaboard Drilling Co., E.D.La., 1963, 215 F.Supp. 909, 910-11, 1965 A.M.C. 346, 347 (Ainsworth, D. J.); see generally 7A Moore's Federal Practice P .215(4), at 2374-75 (2d ed. 1948)
 
 
 [4]
 No date was given for when the Cooper Bessemer No. 6 unit was installed. Gulf Production manager, John D McKay, however, who had worked for Gulf in Louisiana for the past four years, said that it was moved in since he had been there. R. at 201. (Deposition of John D. McKay at 60-61)
 
 
 [5]
 Our holding might be different if Blanchard had been injured while the structures were being floated into position. See Cook v. Belden Concrete Products, Inc., 5 Cir., 1973, 472 F.2d 999, 1002, 1973 A.M.C. 285, cert. denied, 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116
 
 
 [6]
 The statute provides:
 Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.
 Where the principal is liable to pay compensation under this Section, he shall be entitled to indemnity from any person who independently of this Section would have been liable to pay compensation to the employee or his dependent, and shall have a cause of action therefor.
 
 
 [7]
 See also our decision in Gorsalitz v. Olin Mathieson Chem. Corp., 5 Cir., 1970, 429 F.2d 1033, 1038-46, upholding a jury verdict that applied the major repair exception under Louisiana law
 
 
 [8]
 An application for certiorari or writ of review to the Supreme Court of Louisiana was denied in Cain with the remark: "no error of law in the court of appeal judgment." Cain v. Witco Chem. Corp., La., 1977, 343 So.2d 1078. In Vincent, however, the court of appeal noted:
 Although we observe that writs were denied in Cain, supra, we do not feel compelled to follow such decision. Our Supreme Court has held many times that their refusal to grant writs, although persuasive, does not establish a legal precedent since the Supreme Court is not bound by its refusal of writs, to adopt law expressed in appellate court opinions. Garlington v. Kingsley, 289 So.2d 88 (La.1973); Colonial Pipeline Company v. Agerton, 289 So.2d 93 (La.1974).
 
 
 [352]
 So.2d at 1069. No application for a writ of review was filed in Vincent
 
 
 [9]
 For a description of the development of this important device of federalism, see Brown, Certification Federalism in Action, 7 Cumberland L.Rev. 455 (1977)
 
 
 [10]
 We repeat what we have often said in the past:
 (T)he particular phrasing used in the certified question is not to restrict the Supreme Court's consideration of the problems involved and the issues as the Supreme Court perceives them to be in its analysis of the record certified in this case. This latitude extends to the Supreme Court's restatement of the issue or issues and the manner in which the answers are to be given, whether as a comprehensive whole or in subordinate or even contingent parts.
 Martinez v. Rodriguez, 5 Cir., 1968, 394 F.2d 156, 159 n.6.