**Monta H. PENTON, Plaintiff-Appellant,**

v.

**CROWN ZELLERBACH CORPORATION, Defendant-Appellee.**

**No. 82–3443 Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

March 7, 1983.

---

Klein & Klein, Burton G. Klein, New Orleans, La., for plaintiff-appellant.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Stewart E. Niles, Jr., New Orleans, La., for defendant-appellee.

Before GEE, RANDALL and TATE, Circuit Judges.

PER CURIAM:

Louisiana's workmen's compensation statute permits an employee of an independent contractor to recover workmen's compensation benefits from the principal employer on a project if the employee is either injured while performing tasks customarily done by the principal's own employees or is injured while performing tasks that are an integral part of the principal's business. L.S.A.–R.S. § 23:1061. *See Blanchard v. Engine & Gas Compressor Services, Inc.*, 613 F.2d 65 (5th Cir.1980) (*Blanchard II*). In addition to providing an independent contractor's employee with a remedy in the event of work related injuries this statutory relationship shields the principal employer from tort liability. *Blanchard II, supra,* at 69. The existence of a statutory employment relationship is a question of fact to be determined by the totality of circumstances surrounding a plaintiff's claim. *Id.* The present diversity action, sounding in tort, challenges the propriety of the district court's grant of summary judgment in favor of a principal employer. The district court reasoned that a statutory employment relationship existed whenever any injured employee's task "could have" been performed by the principal's own employees. Without expressing a view as to whether a statutory employment relationship does or does not exist, we believe that the district court was mistaken in its application of Louisiana's workmen's compensation statute and its attendant principles. In consequence, we reverse the district court's judgment.

*Background*

During 1976 Crown Zellerbach Corporation ("Crown") began a "modernization" program designed to update and modify its Bogalusa plant facility, a paper mill. The record reflects that the total project was to take place over a four year period at a cost of $125,000,000. Much of this work was contracted out; however Crown both utilized its own employees[1] to perform various tasks and retained general supervision over all work performed by designating itself the project's general contractor.

Overall the modernization project employed approximately thirty independent contractors representing a pool of some 1,500 laborers of varying degrees of skill. Brock and Blevins Co., Inc. held the contract to install the "green liquor/odor control system" which was part of a recausticizing project. In turn, the recausticizing project was a component of Crown's larger modernization program.[2]

---

1. The parties agree that Crown's maintenance department, consisting of approximately 850 laborers of varying degrees of skill, was extensively utilized throughout the modernization program. As appellant notes, however, the vast majority of the maintenance department consisted of "machine operators, such as evaporator operators, rewind operators, lime recovery and caustic operators, machine tenders, recovery room operators, plant operators, utilities operators and wood room operators," skills unrelated to maintenance and repair. Thus of the total maintenance department only 196 could actually contribute to Crown's modernization program: electricians (37), pipefitters (41), carpenters (8), brickmasons (5), instrument repairmen (13), millwrights (69), welders (21) and crane operators (2).

2. The parties disagree as to the dollar value of the recausticizing program and the value of the Brock and Blevins contract. Crown places the value of the recausticizing at $1,700,000 and avers that the Brock and Blevins contract was valued at no more than $746,000 if cost over-

Appellant, Monta Penton, was employed by Brock and Blevins as a welder on the control system. On July 2, 1980, while working in this capacity, Penton was injured as a result of inhaling toxic gas emanating from a sulphur fire. Invoking diversity jurisdiction, Penton instituted the present tort action alleging that Crown—through its negligence—failed to maintain a safe work environment. Penton subsequently amended his complaint to include Brock and Blevins as a third-party defendant. Crown moved for summary judgment on the ground that it was immune to suit by virtue of Louisiana's workmen's compensation statute. The district court reasoned that because Penton was performing tasks which could have been performed by Crown's employees he was Crown's statutory employee within the meaning of *Blanchard II, supra*. The district court also dismissed the third-party complaint against Brock and Blevins as moot.[3] Penton now appeals only the grant of summary judgment.

Our analysis begins with Louisiana's workmen's compensation statute.

### The Statute

That portion of Louisiana's workmen's compensation statute which concerns us today reads as follows:

Where any person (in this section referred to as principal) undertakes to execute any work, which is part of his trade, business or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contract of the whole or any part of

the work undertaken by the principal shall be liable to pay any employee employed in the execution of the work, or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had immediately been employed by him; . . . .

L.S.A.–R.S. § 23:1061.

Over the years the above language has been subjected to conflicting interpretations.[4] In the seminal case of *Blanchard II, supra*, we drew upon traditional mechanics of statutory analysis and the reasoning of past courts in reconciling these competing interpretations and enunciating the view that:

[t]he proper standard, as we see it, is whether the activity done by the injured employee or his actual immediate employer is part of the usual or customary practice of the principal or others in the same operational business.

More specifically, we should first consider whether the particular principal involved in the case customarily does the type of work performed by the contract and whether the contractor's work is an integral part of the work customarily performed by the principal. If either of these situations exist, then there is a statutory employment relationship and the inquiry ends there. If, however, the principal does not normally engage in this type of activity, or if it is not normally a part of the practices, then it is necessary to determine if others engaged in businesses similar to that of the principal customarily do this type of work, or if it is an integral part of their businesses. If

runs were included. In contrast, appellant contends that the total recausticizing program was valued in excess of $18,000,000 and the Brock and Blevins contract actually consisted of two agreements totaling more than $3,000,000. Irrespective of this apparent conflict, the record reflects that the recausticizing and its related control system work were integral parts of Crown's long range modernization program.

3. On the present record we cannot determine why the third-party complaint was dismissed as moot.

4. "Before applying the federal test, however, we must, being *Erie* bound, have a clear idea of Louisiana law on statutory employees. But despite briefs, oral argument, and our own research, which consists of reading the many, many cases by us and the many more by Louisiana appellate courts trying to fathom what is part of [an employer's] trade, business, or occupation, we are still in doubt about the underlying state law."

*Blanchard v. Engine & Gas Compressor Service*, 575 F.2d 1140, 1144 (5th Cir.1978) (*Blanchard I*).

either of these inquiries yields an affirmative answer, then the general custom of the trade will control to make the relationship between the principal in question and his contractor's employees that of a statutory employer and employee.

613 F.2d at 71 (5th Cir.1980).

In sum, *Blanchard II* provides that a statutory employment relationship exists if (1) the activity which occasions the injury of an independent contractor's employee is the type of work customarily done by the principal's own employees; or (2) the employee is injured while engaged in an activity which is an integral part of the principal's business. *Id.* This test is more readily stated than applied. "Typically, whether the work performed by the injured worker's employer is part of the trade or business of the ostensible statutory employer is an issue of fact to be determined according to the circumstances of each case." *Ortego v. Union Oil Company of California,* 667 F.2d 1241 (5th Cir.1982) (per curiam).

■ To say that each case must ultimately turn on its facts is not to preclude the presence of a common approach which directs the outcome of section 1061 cases. Our reading of *Blanchard II* and its progeny reveals that a statutory employment relationship will be found only in those instances where the injured employee's employer is contracted to perform work which is so closely allied to that of the principal employer that it is in fact either an extension or component of the principal's commonly relied upon resources.[5] *See Williams v. Shell Oil Company,* 677 F.2d 506 (5th Cir.1982); *Darville v. Texaco, Inc.,* 674 F.2d 443 (5th Cir.1982); *Barrios v. Engine & Compressor Services,* 669 F.2d 350 (5th Cir. 1982). In this connection, focus is directed to the relationship between the independent contractor and the principal employer rather than the specific duties of the injured employee. *See Murphy v. Georgia Pacific Corp.,* 628 F.2d 862 (5th Cir.1980). Moreover, in evaluating this relationship we must consider the underlying practical and economic realities of the principal's business interests as well as its characterization of those interests. *Blanchard II, supra,* at 71.

Against this framework we turn to the merits of the present case.

### The Judgment

■ Prior to proceeding we briefly review the standards by which we measure the validity of summary dispositions. It is axiomatic that summary disposition is proper only "if the pleadings, depositions, answers to interrogatories, and admissions, on file together with the affidavits, if any, show that there is no genuine issue as to any material facts." Fed.R.Civ.P., 56(c). We also note that within this circuit the burden of proving the absence of a genuine factual dispute falls squarely upon the party seeking summary judgment; and in considering whether a moving party has met its burden we must consider the record in its entirety and "resolve every reasonable inference in favor of the party opposing the motion." *Murphy, supra,* at 866. Moreover, it is our duty to examine the record as it existed at the time summary judgment was granted, without regard to facts or allegations not submitted to the trial court's scrutiny. *See McDonnell v. Estelle,* 666 F.2d 246 (5th Cir.1982). Crown urges that it has met its burden of proof. Within this argument, it also contends that the factual assertions which it submitted to the trial court in support of summary judgment must, as a matter of law, be accepted as true because appellant failed to respond

---

5. We do not mean to embrace the "essential to business" test specifically rejected by this court in *Blanchard II, supra,* at 71. Rather, as that panel reasoned, we must look to the practical and economic necessities of the principal's business in determining the existence of a statutory relationship:

Just as § 1061 prevents a principal from avoiding statutory employer status and

workmen's compensation liability by contracting out all his business, this provision also implies that the mere fact that a principal contracts out all of his work does not necessarily mean he is *not* a statutory employer for purposes of avoiding tort liability. (emphasis original).

meaningfully to these assertions.[6] We disagree with both Crown's primary and ancillary arguments.

In support of its motion for summary judgment Crown submitted three affidavits and deposition excerpts as well as sixteen material facts to which it stated there was no issue to be tried.[7] Extrapolating from its factual assertions Crown set forth the same legal theory it now asserts on appeal:

In determining whether defendant successfully meets the standard required by the *Blanchard II* test, it should be remembered that plaintiff was working for C–Z [Crown] as a welder; the duties he performed were those of an ordinary pipefitter/welder and required no special training, expertise, or experience other than would normally be incurred as a regular, certified welder. Not only did C–Z employ welders, other skilled craftsmen were employed for new construction,

modernization and modification. From the Martin Affidavit, attached to defendant's Motion for Summary Judgment, it is evident that the type of work being done by plaintiff was customarily performed by defendant. Customary business operations demanded that C–Z employ sixty-two (62) skilled craftsmen in the same category of work as plaintiff. Additionally, C–Z utilizes approximately 40% of its regular mill labor for modification and construction within the plant; in fact a large portion of C–Z's business within the mill is dedicated to modification and construction, and C–Z undertook with regularity projects of new construction as well as repair, maintenance and modification.

Plaintiff was employed by third party defendant B & B, pursuant to a contract between C–Z and third party defendant, which was part of the recausticizing

**6.** Crown argues that Penton failed to respond in kind to its factual assertions. *See* note 7, *infra.* Crown also urges that deposition testimony of certain of its managers was improperly admitted because it was given in regard to a different case evolving out of the same alleged wrong. Because we believe that Crown has not met its burden of proof it is not necessary to examine appellant's response to determine whether the evidence there rebuts Crown's assertions. *See Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026 (5th Cir.1982). As to the admission of the deposition testimony we simply note that we do not believe the trial court abused its discretion. *See Miller v. Universal City Studios, Inc.,* 650 F.2d 1365 (5th Cir.1981); *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250 (5th Cir.1980).

**7.** Crown summarizes these sixteen points, on appeal, as eighteen separate points:
(1) That the modification to C–Z's [Crown's] facility took over four (4) years and consisted of twelve (12) separate and distinct projects;
(2) That the modification to C–Z's facility included repair, maintenance, modification and new construction;
(3) That such projects are customarily undertaken by C–Z with its own personnel;
(4) That three of the twelve projects utilized *only* C–Z employees;
(5) That the recausticizing project was one of the twelve projects undertaken;
(6) That plaintiff was injured while working on the recausticizing project;
(7) That plaintiff was an employee of B & B [Brock and Blevins], to whom the contract

for only a portion of the recausticizing project was awarded;
(8) That plaintiff was injured while in the course and scope of his employment;
(9) That plaintiff was employed as a welder/pipefitter and C–Z maintained over sixty pipefitters/welders;
(10) That pipefitting and welding is an integral part of the work done by C–Z (otherwise C–Z would not maintain 60 to 70 pipefitters and welders on its payroll);
(11) That the recausticizing project was a modification to the lime kiln area of the plant;
(12) That C–Z has performed numerous jobs similar to that required in the contract with B & B;
(13) That any operating, totally integrated paper mill such as C–Z would have the skills to perform such work as was done by B & B;
(14) That C–Z performed other projects, larger in size and scope, than that required in the contract with B & B;
(15) That pipefitter/welders are an integral part of C–Z's working operations;
(16) That the work done by B & B, pursuant to the terms of the contract, required a relatively few number of workers;
(17) That plaintiff's duties were no different than those of any other pipefitter/welder, whether such welder was a C–Z employee or a subcontractor employee; and,
(18) That between the years 1976 and 1980, C–Z performed 177 projects of repair and modification using only its own employees.

project undertaken at the facility in Bogalusa. It was a modification to the lime kiln area of the plant. Inasmuch as C–Z employs a maintenance crew which is over 40% of its total work force, and such maintenance crew specifically provides repair and maintenance within the plant, including modifications and up-dates to existing facilities, it is obvious that the work being done by B & B [Brock and Blevins], and specifically by plaintiff herein, is an integral part of C–Z's business.

We recognize the above legal theory as plausible; however, like the myth of the lemming drawn to the sea, it suffers the all too prevalent and unfortunate characteristic of attempting to meet legal standards by slight of hand rather than analysis and confrontation.

■ The sole issue on appeal is whether the magnitude and type of Crown's update and modification of the Bogalusa plant facility was part of its usual and customary practice. This issue cannot be met through the blanket characterization of the total project as "modernization." Nor is it sufficient to say that the total project actually consisted of twelve independent and distinct projects and that Crown employed the requisite personnel to complete any one of them without outside assistance. Nor is it of consequence, on the present facts, that Crown's maintenance employees performed 177 projects of repair and modification during the years 1976–1980, the period of the larger modernization program.

Penton's complaint charged that Crown's modernization program was actually one on-going project which required a commitment of labor and technical expertise far beyond Crown's capacity. More, the complaint argues that the program was unique and not within Crown's normal operations. The record does not dispute these contentions. The deposition testimony of members of Crown's management team clearly indicates that Crown considered the modernization to be one major construction project and that Crown did not have the requisite personnel to undertake such a large scale project itself. The testimony also reflects that the total project could not have been completed within Crown's self-imposed time limit if independent contractors were not brought in.[8] Moreover, there is a strong suggestion that Crown found it necessary to realign its management structure to effectively meet the managerial requirements of this specific project.[9]

---

8. Robert C. Martin, Crown's Project Manager, expressly stated that the project was beyond Crown's capabilities:

Q. Do you recall a project of this size, dollarwise, and work amount, having been done previously at this plant?
A. No.
Q. This project required a great deal of skilled labor, and various crafts with various expertise. Is that correct?
A. It required various crafts with various expertise.
Q. Is that why it was contracted out?
A. No.
Q. Why was it contracted out?
A. We had the craft and the skill that was required to do a job like this. However, with the size of the crew we had it might have taken us 20 years to do the job. For economic reasons we could not afford to take on that kind of a project in the time span it needed to be completed in. Therefore, we decided to sub-contract some of the work.
Q. So because you didn't have the personnel to do a job of this magnitude, and keep the other phases of your plant in operation, you contracted out?

MR. NILES: I object to the form only in the sense, and for the purpose of, clarity. By personnel do you mean number of personnel?
BY MR. KLEIN:
Q. I will rephrase it.
Because of the large number of personnel required, even though you may have had people working here with the skill and expertise necessary, but for the reason I have just stated, you contracted this work out? Is that not what you testified to, sir?
A. That is part of the reason.
I would say because of the large number of personnel required and the amount of time that we wanted to do the job in.
Record, vol. 2, at 146–147.

9. Two top corporate executive positions were created for this 1977–80 major modernization program. One was project manager created for, and terminated at the end of, the project. Mr. Charles George, a Crown Zellerbach engineer, testified:

Q. Anyway, after Mr. Martin became the resident manager, who succeeded him as the project manager of this project?

While the deposition testimony of Crown employees cuts against the district court's grant of summary judgment, it is not necessary to go that far. Crown's assertion that its maintenance department completed over 177 projects rings hollow absent any showing of the magnitude—both labor and dollars—of those projects. More important, it seems to us incredible to suggest that the addition of 1,500 temporary workers and the expenditure of $125,000,000 for "modernization" is, as a matter of law, within the customary and usual practice of a paper mill without a full airing of its day-to-day operations. Conceivably, after such an airing, a jury could find Penton to be Crown's statutory employee. Here, we cannot.

Our remaining point is brief. Crown makes much of the fact that it employed welders similar in skill to appellant. As we noted above, the focus in section 1061 cases is directed to the relationship between the independent contractor and the principal employer rather than the specific duties of the injured employee. While the duties of the injured employee may be probative of the existence of a statutory relationship, standing alone those particular duties are of little consequence. Thus the argument that Crown employed persons who could have performed appellant's particular task, without more, does little more than muddy the waters.

In examining the record as it existed at the time summary judgment was granted, we simply do not believe that Crown has sustained its burden of proof. We do not believe that it can be said with any degree of certitude that this "modernization"

project was part of the usual or customary practice of Crown's trade, business, or occupation.

Accordingly, the judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

A. This job was eliminated at this time.
Q. So, in other words, the project manager's title was to cover that particular job that was going on?
A. Right.
Record, vol. 2, at 242.
The other job was a contracting coordinator. Mr. Floyd Wightman held the job. Mr. George continued:
Q. He was temporarily assigned to Bogalusa?
A. Yes.
Q. And temporarily assigned to Bogalusa during the period covered by this project, is that right?

A. Yes, that's correct.
Q. And when the project was completed, this particular project, and you know what project I'm talking about, in 1980 he returned back to Seattle where he is now?
A. That's correct.
Q. And has anybody taken his place down here?
A. No, sir.
Q. The job does exist?
A. It was eliminated.
Record, vol. 2, at 276–277.