373 So.2d 1312 (1979)
Raymond Alfred THOMPSON
v.
NEW ORLEANS PUBLIC BELT RAILROAD and B & G Crane Service Inc.
No. 9944.
Court of Appeal of Louisiana, Fourth Circuit.
July 3, 1979.
*1313 Garland R. Rolling, Metairie, for plaintiff-appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Harry S. Hardin, III, Ewell E. Eagan, Jr. and Gerald F. Slattery, Jr., New Orleans, for defendant-appellant New Orleans Public Belt R. R.
James J. Morse and Frank J. Achary, New Orleans, for defendants-appellees B & G Crane Service, Inc., and Travelers Ins. Co.
Before REDMANN, LEMMON, SCHOTT, BEER and GARRISON, JJ.
GARRISON, Judge.
This is an appeal from a tort action for personal injuries sustained by plaintiff when he was struck in the back by a load of railroad ties being lifted by a crane. Plaintiff sued his employer, New Orleans Public Belt Railroad, Inc., under the Federal Employers' Liability Act (45 U.S.C. § 51 et seq.). Named as additional defendants were B & G Crane Services, Inc. (owner of the crane and employer of the crane operator), and Hill-Behan Lumber Company (owner of the truck from which the railroad ties were being unloaded). Public Belt, B & G/Travelers, and Hill-Behan all filed third-party demands against one another.
The claims against Hill-Behan were dismissed on a motion for summary judgment, and that dismissal was not appealed. After trial on the merits, judgment was rendered in favor of plaintiff and against defendant Public Belt in the amount of $60,900 with judicial interest and costs. Plaintiff's demand against B & G and Travelers was dismissed, as was Public Belt's third-party demand against them. B & G's and Travelers' third-party demands against Public Belt were dismissed as moot. In his written Reasons for Judgment, the trial judge found that the crane operator was negligent; that plaintiff was free of any primary or contributory negligence; and that the crane operator was a borrowed employee of Public Belt, thereby absolving his general employer, B & G, of any liability toward plaintiff. He further found that there was no evidence of delictual or contractual liability on the part of B & G toward Public Belt, and dismissed the railroad's demand for indemnification or contribution.
Public Belt has appealed, contending that the trial judge erred (1) in determining that plaintiff was completely free of any negligence,[1] and (2) in determining that the crane operator was a borrowed employee of Public Belt.

FACTS
The facts under which plaintiff's injury occurred are relatively undisputed. Rather, what is disputed is the interpretation to be placed on those facts.
At the time of the accident (July 16, 1975), Raymond Thompson had been employed by the New Orleans Public Belt Railroad for almost twenty-three years. On the day of the accident, he was an assistant bridge supervisor and was overseeing the unloading of timbers to be used as railroad ties. The timbers were stacked in bundles of a dozen each on the flatbed trailer of a Hill-Behan truck, and were being unloaded by means of a crane. The crane and its operator, Irvin A. Bourgeois, Jr., had been leased from B & G Crane Services, Inc. The truck was parked parallel to the tracks and the crane, which had stabilizer legs, was straddling the tracks. The ties were being unloaded from the truck and placed in a stack at the rear of the truck on the ground between the truck and the tracks. The crane had unloaded the ties on the back portion of the truck and was beginning to unload the bundles on the front section of the flatbed.
Plaintiff had been standing on the ground to the left of the crane, near the cab of the truck. The crane had lifted the next load of timbers and was pivoting them toward the stack on the ground. Plaintiff *1314 moved from his place near the cab to a spot near the middle of the flatbed to call out an instruction to one of his fellow supervisors who was standing on the other side of the flatbed, across from him. The load of timbers on the crane began swinging and struck plaintiff in the back, crushing him between the load and the truck bed.
Thompson's injuries included multiple fractured ribs, fractures of both clavicles, and a punctured and collapsed lung. He was hospitalized for approximately 48 days and was unable to return to work for about five and one-half months. The parties stipulated to his lost wages ($900)[2] and to his medical records, which showed him to have a 15% permanent partial impairment of his right arm and a 10% permanent partial impairment of his left arm due to the injury. The railroad had paid his medical expenses to the date of trial, in the sum of $24,677.05.

NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE
It seems clear from the record that Irvin Bourgeois, the crane operator, was negligent in his operation of the crane. His testimony was somewhat contradictory to the other eye-witness accounts, in that it indicated that he was loading rather than unloading the truck. He described the accident as follows:
"A. Well, what I was doing was picking up the load straight up in the air and just booming down on top the truck with it.
* * * * * *
Well, the only thing I remember is the gentleman flagging me, and he gave me the signal to do what I had to do to put it on the truck, and it was to my own judgment to how high to pick it up and how far to boom down with it, and I misjudged it and hit the side of the truck, and when I did, the gentleman was on the side. I didn't even see him until the men told me that was standing on the truck.
"Q. I see. You misjudged the load and hit the load against the side of the truck, is that correct?
"A. Yes, sir."
Bourgeois could not remember who had given him the signal to pick up the load. He testified that several people had been flagging him during the operation rather than one particular person. He stated that Thompson had been standing to the left of the crane immediately before the accident, but that he did not see Thompson after he picked up the load to move it. The next time he saw him was when the men on the bed of the truck told him he had hit Thompson.
Bourgeois testified that the load did not begin to swing until it started booming down. He described the manner in which he would pick up a load:
"THE WITNESS:
"When you first lift it, you go up with it with the load line. If you would boom it up it would swing into you or away from you.
"MR. HARDIN:
"Q. So you lifted the load line?
"A. You have to lift it straight up first to clear the ground.
"Q. And what was your next movement?
"A. Boom it down onto the truck.
"Q. Okay. Now, this particular load that struck Mr. Thompson, when you lifted it, did it rock or swing in an unusual manner?
"A. Not until the time it started booming down. When I pick it up it just goes straight up, it doesn't move."
Michael Bertucci, one of the Public Belt laborers assisting in the operation on that day, testified that the crane had just lifted the load and was taking it off the truck. He stated that the crane operator was booming up the load when it started to swing, and as it was being boomed down, Bertucci saw Thompson standing in the middle of the truck bed. He said the load was swinging into the truck and out, and he *1315 yelled to Thompson to watch out. Thompson had his back turned to the load and was hit. Bertucci testified that he himself had been giving the crane operator signals, but he didn't know who else was giving signals; he stated that he didn't see anyone else giving signals. He testified that he had assisted in this type of operation before and had sometimes seen loads bump into trucks before. He stated that this had happened before at times when Thompson was supervising the operation. Bertucci drew a diagram of the accident scene which was submitted into evidence as Exhibit Public Belt-1. His diagram showed the crane as standing on the tracks more or less behind where Thompson was standing when he was struck. His diagram differs somewhat from that of E. J. Garland, which will be discussed later.
Emile Clade, a Public Belt employee who had been a crane operator for 31 years, testified that he was standing on the other side of the truck with Mr. Garland, the bridge supervisor, and Mr. Dujmov, an assistant supervisor. He stated that Thompson had been standing near the front of the truck and had walked toward the middle after the crane picked up the load. He said the load first swung away from the plaintiff toward the crane, then Thompson walked by, the load swung back, and it hit Thompson. He testified that he didn't know what made the load swing; however, from his experience as a crane operator, if the boom is up too high when it picks up a load the load will tend to swing toward the crane. In addition, he stated, if the operator moves the load too fast or too hard, the load will swing.
Edward F. Garland, the Public Belt bridge supervisor, who was standing with Mr. Clade and Mr. Dujmov on the other side of the truck, testified that Thompson had been standing approximately at the rear end of the truck's cab and was clear of the load being picked up. The load was in the process of moving when Thompson walked toward the center of the truck. As the load was being lowered it was swinging; Garland saw what was going to happen and tried to call out to Thompson, when the load swung back and hit Thompson. Garland, like Bertucci, drew a diagram of the accident scene. This was submitted into evidence as Public Belt-2, and varies from Bertucci's in that the crane is shown as placed almost parallel to the cab of the truck. However, Garland testified that although the cab of the crane was close to the cab of the truck, it was closer to the center of the truck than shown on his diagram. Garland testified further that loads frequently swing when they are being picked up by a crane.
Raymond Thompson, the plaintiff, testified that he had moved to the center of the truck and was calling across the truck to Mr. Dujmov when he was struck in the back by the load and dropped under the truck bed. He stated that he was standing in the center of the truck bed before the crane operator started to take the load off the truck. He could not remember whether he had given the crane operator any signals regarding the movement of the truck at that time. He stated that the intended path of the load was over his back and to the right. He estimated that he had supervised the loading or unloading of approximately 30,000 pieces of timber during his career with Public Belt. He further stated that there was no one particular place where he would customarily stand during these operations, but that he moved all around. In addition, any of the other men involved in the procedure would customarily give the crane operator signals.
In his Reasons for Judgment, the trial judge concluded that Thompson was not standing in the path of the load under any normal movement. He concluded:
"[T]he crane operator was guilty of negligence which was the proximate cause of plaintiff's injury in that the crane operator failed to maintain a proper control of the crane, failed to maintain a proper lookout, and operated the crane in such a manner as to cause its load to strike against the truck."
He further concluded that Thompson was free of any negligence which may have caused or contributed to the accident.
*1316 Appellant Public Belt contends that Thompson was negligent in walking toward the middle of the truck while the load was suspended; that he "voluntarily placed himself in a position of danger, in front of a suspended swinging load with his back turned; where he could be, and ultimately was, struck and injured." The appellant contends that, given his years of experience in supervising similar unloading situations, Thompson was guilty of a gross disregard for his safety when he walked to the side of the truck and stood with his back turned to a suspended swinging load.
From the record before us, however, including the diagrams drawn by Mr. Bertucci and Mr. Garland, defendant has not carried the burden of proving contributory negligence, since it is not clear that the position in which Thompson placed himself was one which he should have known was dangerous. The Louisiana standard for appellate review of fact, stated in Canter v. Koehring, 283 So.2d 716 (La.1973) and recently re-emphasized and clarified in Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978), requires a finding of manifest error in reversing a factual finding of a trial court.
"`Manifestly erroneous,' in its simplest terms, means `clearly wrong.' ... [T]he appellate court should not disturb such a finding of fact unless it is clearly wrong," Arceneaux v. Domingue, supra, at 1333. (Original emphasis).
There is no "manifest error" in the conclusions of the lower court here; the finding of no negligence on the part of Mr. Thompson is not "clearly wrong." Accordingly, the conclusion of the trial court, absolving the plaintiff from negligence, is to be upheld.

"BORROWED EMPLOYEE" QUESTION
Irvin Bourgeois, the crane operator, was employed by B & G. On the day of the accident, B & G had rented the crane to Public Belt on an "operated and maintained" basis (i. e., B & G furnished not only the crane but also the operator, fuel, insurance, and everything else necessary to the crane's operation). The fee for Bourgeois' services was included in the charges billed to Public Belt, so that Bourgeois was paid by B & G rather than by Public Belt. The testimony is clear to the effect that Bourgeois reported for work at the time dictated by Public Belt; that no one from B & G accompanied him to the job to direct him; that Public Belt employees told him what specific task he would be performing that day; and that Public Belt employees signalled to him regarding when to pick up or put down loads and where to place them.[3] However, they did not instruct him in operating the crane; Public Belt, if not satisfied with his work, could have taken him off the job and requested another crane operator from B & G, but Public Belt could not have forced him from his job with B & G; further, B & G trained each of its operators and selected the employee to be sent on each job.
Public Belt contends that the trial judge erred in ruling that Bourgeois was a borrowed employee of Public Belt and in absolving B & G and its insurer of liability for plaintiff's injury. Citing the recent decision of our Supreme Court in LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978), reh. den. December 14, 1978, Public Belt avers that under LeJeune, even if Bourgeois is held to be a borrowed employee of Public Belt (his special employer), B & G (his general employer) cannot be exculpated from liability for its employee's negligent acts.
The most frequently used test to establish the employer-employee relationship involves the right of control:
"`The most widely accepted test cited for establishing an employer-employee relationship involves the right of control. Benoit v. Hunt Tool Company, supra (219 La. 380, 53 So.2d 137); Ruiz v. Shell Oil Company, 413 F.2d 310 (5th Cir. 1969) (action arising under the *1317 Longshoremen and Harbor Workers Compensation Act). The right of control has been described to include the following factors: the right to select and discharge the employee, the right to supervise and direct his work, and the method by which it is done, and the manner in which the employee is paid. (citations omitted.)
Implicit in the right to control is the necessity that the lending employer relinquish its control over its employee to the borrowing employer and that he is performing work for the borrowing employer's business. Benoit v. Hunt Tool Company, supra; Berry Brothers General Contractors, Inc. v. Air Marine, Inc. supra [328 So.2d 771 (La.App.)]. Additionally, the concept of the `borrowed employees' doctrine, by its terms, connotes an agreement of some type between the lender and the borrower, that the lender relinquished such control of the employee to the borrower. Ruiz v. Shell Oil Company, supra; Malone, § 57, pp. 61-66, pocket part, § 57, pp. 14-21.'" Dupre v. Sterling Plate Glass & Paint Co., Inc., 344 So.2d 1060 (La.App. 1st Cir. 1977), as quoted in Vincent v. Ryder Enterprises, Inc., 352 So.2d 1061 at 1066 (La.App. 3rd Cir. 1977).
"[The general employer has] the heavy burden of overcoming the presumption that he retained control (and thus remained liable for his employee's tort) and of proving that `the relationship of master and servant which previously existed between the general employer and employee has been suspended, that a new such relationship has been created between the borrowing employer and that employee, and that such new relationship was in existence at the time the accident occurred.' Vincent v. Ryder Enterprises, Inc., 352 So.2d 1061, 1067 (1977)." (Footnote omitted.) LeJeune v. Allstate Ins. Co., supra, at 480.
In the LeJeune case, the court found that for some purposes the employee in question may have been a borrowed employee. However, this did not absolve the general employer of liability:
"Nevertheless, this determination should not relieve the general employer of his liability for his employee's negligent acts done in the pursuance of duties designated for him by his employer, in whose pay he continued and who had the sole right to discharge him." 365 So.2d at 481.
The Court noted that the LeJeune situation was different from most of the "borrowed employee" cases commonly cited. In those cases, the liability dispute was between the general employer and the special employer inter se; or regarding the special employer's liability in tort versus in workmen's compensation; or they were cases which "in fact, held the general employer [liable] for the borrowed employee's tort by applying the stringent exculpatory test required of a general employer attempting to avoid liability to a third person for damages caused by his employee's tort." (Original emphasis.) LeJeune, supra, at 481. In LeJeune, the question before the Court, however, was whether the general employer must be absolved of tort liability to a third person injured by his employee while the borrowed employee of another.
"In Lowenburg v. Labor Pool of America, Inc., 296 So.2d 846 (La.App. 4th Cir. 1974), the court held both general and special employer solidarily liable in tort to a third person injured by the employee's negligent act. The court pointed out that while the borrowed employee was subject to the special employer's supervision and direction while performing work for him, nevertheless he remained in the employment of and subject to direct orders of his general employer, who had ordered him to perform duties for the special employer.
We denied certiorari sought by both the special employer, 300 So.2d 191(1) (La.1974) and the general employer, 300 So.2d 191(2) (La.1974).
"In our view, this principle is here applicable. It is consistent with our holding that both general and special employer are solidarily liable to the borrowed employee for workmen's compensation, if he is injured at work for the special employer.

*1318 Humphreys v. Marquette Casualty Co., 235 La. 355, 103 So.2d 895 (1958). Further, as we have noted, despite the confusion in the jurisprudencein that seemingly indistinguishable facts produce disparate results as to whether a borrowed employee is still subject or not to the control of his general employer so as to have abandoned or not the latter's employment, the jurisprudence almost uniformly has held the general employer is liable to a third person for the employee's torts, when that issue has arisen.
"A number of other jurisdictions have likewise held that both the general and special employer may be held solidarily liable for the employee's tort. We believe this to be the better rule and, accordingly, overrule expressions indicating to the contrary, as well as the two decisions of the intermediate courts (see footnote 11) which expressly held the general employer not liable to a third person for torts committed by his employee while loaned to a special employer.
"We conclude, therefore, that under the circumstances, Ville Platte, the general employer, is liable to the plaintiffs for the damages caused them by Lafleur while negligently driving the hearse for Mamou." (Footnotes omitted.) 365 So.2d at 481, 482.
The LeJeune decision established a new principle in Louisiana that both general and special employers may be held solidarily liable for a borrowed employee's tort. The LeJeune case has since been followed by the Third Circuit in Williams v. Mike Queenan Equipment Company, Inc., 366 So.2d 645 (La.App. 3rd Cir. 1978). In that case, the court reversed a summary judgment in favor of the general employer which had dismissed it from the lawsuit. The Williams court concluded that the factual situation before it was similar to that in LeJeune.
The facts in the present case seem to fit within the LeJeune parameters. Here, while Bourgeois was a borrowed employee for some purposes, in that he was subject to the supervision and direction of Public Belt employees while performing work for them, he remained employed by and subject to direct orders of B & G, which ordered him to perform duties for Public Belt. Accordingly, B & G should be solidarily liable with Public Belt to plaintiff Thompson, who was injured by Bourgeois' negligence.
Although B & G and Public Belt are each liable to plaintiff for the whole, one coobligor could be liable for the whole debt toward the other. C.C. art. 2106. In this case, however, each should be held liable toward each other for its virile share of plaintiff's total damages.
An employer may be held liable for damages occasioned by its employee in the exercise of the function in which the employee is employed. C.C. art. 2320. Under modern jurisprudence one of the principal considerations in determining whether an employee is in the exercise of an employment function at the time of the damage-causing act or omission is the question of whether the employee's activity furthered the employer's interest. In the LeJeune case part of the basic reasoning for holding both the lending employer and the borrowing employer liable to the tort victim for the damages caused by the employee's tort was that the employee's activity was mutually beneficial to both employers.
The LeJeune case did not decide the apportionment of damages as between the two employers. The present case requires such a decision, and on the basis of the underlying rationale of LeJeune and of the general concept of an employer's responsibility for its employee's torts, each should be held liable for its virile share toward each other.
Since Public Belt paid $24,677.05 in medical expenses, in addition to the $60,900.00 awarded by the trial court, Public Belt is entitled to a judgment on its third party demand against B & G in the amount of $42,788.52 ($12,328.52 reimbursement of medical expenses, plus $30,450.00 reimbursement of general damages), and B & G is entitled to judgment on its third party demand against Public Belt in the amount of $30,450.00.

*1319 CONCLUSION
Accordingly, the decision of the trial court is affirmed as to its finding of negligence on the part of the crane operator, Irvin Bourgeois, as to its finding of no negligence on the part of Raymond Thompson, and as to the quantum of plaintiff's award. The decision of the trial court is further affirmed as to its finding that Irvin Bourgeois was a borrowed employee of defendant New Orleans Public Belt Railroad, Inc. However, the trial court's decision is amended to make defendants B & G Crane Services, Inc. and Travelers Insurance Company (as insurer of defendant B & G) liable in solido with New Orleans Public Belt Railroad, Inc., for the damages to plaintiff; to award judgment on New Orleans Public Belt Railroad, Inc.'s third party demand in the amount of $42,788.52; and to award judgment on B & G Crane Service, Inc.'s third party demand in the amount of $30,450.00.
AFFIRMED IN PART; AMENDED IN PART.
SCHOTT, J., concurs and assigns reasons.
REDMANN, J., dissents and assigns reasons.
BEER, J., dissents for the reasons assigned by REDMANN, J.
SCHOTT, Judge, concurring.
The trial judge held that Bourgeois (B & G's crane operator) was negligent. He likewise found that plaintiff was free of contributory negligence. This case was argued before and submitted to a panel of three judges in accordance with Art. 5, § 8(A) and two of those three judges proposed to affirm the trial court on these findings. The two judges in the majority also proposed to affirm the trial judge's findings that Bourgeois was a borrowed employee of New Orleans Public Belt Railroad.
The dissenting judge proposed to reverse the trial judge because he believed that plaintiff alone was negligent. He did not reach the issue of Bourgeois being a borrowed servant of Public Belt. Nevertheless, since the majority proposed to affirm the trial judge on this issue the vote of the dissenting judge would not alter the result even if he believed that the trial judge was wrong on this issue.
Thus, the only remaining issue to be considered was the trial judge's dismissal of plaintiff's suit against B & G and the third party demand of Public Belt against B & G for contribution or indemnity.
The dissenting judge declined to consider this issue because he differed with the majority (and the trial judge) on the finding of plaintiff's and Bourgeois' negligence. With the case in this posture it was submitted to a five judge panel pursuant to Art. 5, § 8(B) of the Louisiana Constitution of 1974. I question that referral of this case to a five judge court was mandated by the Constitution under the circumstances and join in the modification of the judgment concurred in by Judges Lemmon and Garrison without reaching the question of Bourgeois' negligence or plaintiff's contributory negligence.
The proposed modification of the trial court's judgment did not result because two of three judges on a panel of this court disagreed with the trial judge. The proposed modification resulted only from the legal effect of the holding that Bourgeois was a borrowed employee of Public Belt when the accident occurred. The trial court held that Public Belt was solely liable in this situation because of the then prevailing jurisprudence with respect to the general employer's liability to a third person, whereas the majority of the panel would hold that B & G and Public Belt are solidarily liable to plaintiff following the recent decision of the Supreme Court in LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La.1978). As the majority points out, the LeJeune decision established a new principle which was not operable when this case was decided by the trial court. The proposed modification did not grow out of a disagreement by two out of three judges on this court with the trial judge but instead from the legal result of a new principle being applied to facts on which two out of three of the judges on this court have agreed with the judge of the trial court.
*1320 With all due respect to the dissenting judge, once his panel decided the issues of negligence and borrowed servant status so as to affirm the trial judge it was incumbent on him to address the legal question presented by Public Belt's third party demand in the light of the LeJeune decision.
The order of April 23, 1979, referring this case to a five judge panel fairly informed the parties that the majority proposed to reverse the trial court only as to the liability of B & G Crane Service. In his supplemental brief filed pursuant to that order plaintiff questioned the referral of this case to a five judge panel. Public Belt, in supplemental brief, naturally defended the referral because it would have two more judges consider the negligence issues even though two judges of this court and the trial judge already decided these issues adversely to Public Belt. Significantly, B & G filed no supplemental brief and has advanced no argument for a five judge panel even though the proposed majority opinion would adversely affect it alone to the exclusion of all the other parties. It seems clear that LeJeune mandates the conclusion reached by the majority as a matter of law.
The whole scheme of the Constitution is to enable this court to sit in panels of three, thereby serving the purpose of judicial economy and making it possible for decisions to be rendered by this court without the additional complication and attendant delay which necessarily comes from involving more judges in the decision making process. The original panel hearing this case failed to reach a decision not because they differed on the ultimate issue but because one judge did not reach the issue.
But the original panel has already decided in favor of plaintiff. He should not be subjected to another step in the appellate process for the issues of the negligence of Bourgeois and himself to be re-examined when two judges of this court have already agreed with the trial court on these issues. Plaintiff was entitled as a matter of law to have his judgment rendered by the three judges who originally considered his case. The referral of this case to a five judge panel would have the effect of conferring on the defendants in this case greater appellate rights than any other appellant receives when his case is affirmed by a two to one vote of the original panel if the case is considered in its entirety by two additional judges.
Therefore, I consider my role on the five man panel as limited to the issue of B & G's liability, accepting the majority's decision on issues of negligence and borrowed servant. It would be unfair to plaintiff for me to re-examine these issues, in that he would be thereby denied protection of the law equal to that afforded any other party who comes before this court.
I concur in the conclusion reached by Judges GARRISON and LEMMON.
REDMANN, Judge, dissenting.
The only breach of duty towards Thompson in this case was by Thompson himself. The trial judge erred in finding "negligence" towards Thompson by the crane operator because of his testimony (wrong at its core, in that he was not loading but unloading the truck) that he misjudged in respect to the truck. The trial judge's recital that plaintiff "was not standing in the path of the load under any normal movement" is insupportable. Indeed, the only one of seven or eight eye witnesses who testified that plaintiff was standing where he was hit, rather than at the truck cab from which place of safety he stepped into the path of an already swinging load, was plaintiff himself. And no one testified that the path of the load was abnormal.
Arceneaux v. Domingue, La.1978, 365 So.2d 1330, explains that Canter v. Koehring Co., La.1973, 283 So.2d 716, does not authorize blind affirmation of a trial judge's factual inference if there is any evidence to support it. The rule is that the trial judge's inference must be not only supported by some evidence but moreover must not be clearly erroneous. This judgment's inference fails on both tests. The judgment should be reversed.
NOTES
[1] Under the F.E.L.A., contributory negligence is not a bar to recovery in a tort action; rather, the damages are reduced in proportion to the percentage of plaintiff's contributory negligence. See 45 U.S.C. § 53.
[2] Public Belt continued to pay part of his wages while he was out of work.
[3] Paraphrasing Footnote 9 in the LeJeune case, we note that Public Belt would tell Bourgeois what, when and where to lift and move with the crane, but not how.