Charlotte NUNEZ, Wife of
and Milfred J. Nunez

v.

**B & B DREDGING, INC., Clarendon America Insurance Company, A & A Towing, L.L.C., Arthur Prestenbach, Sr., and Credit General Insurance Company.**

**No. CIV.A. 98–2572.**

United States District Court,
E.D. Louisiana.

July 20, 2000.

---

Pete Lewis, Lewis & Caplan, New Orleans, LA, for Charlotte Nunez, Milfred J Nunez.

Patrick J. McShane, Frederick T. Greschner, Jr., Frilot, Partridge, Kohnke & Clements, LC, New Orleans, LA, for Clarendon America Insurance Co.

Valerie A. Young, Craig Wren Brewer, Metairie, LA, Anthony John Staines, Staines & Eppling, Metairie, LA, Eugene W. Policastri, Staines & Eppling, Metairie, LA, for A & A Towing L L C.

Valerie A. Young, Craig Wren Brewer, Metairie, LA, Anthony John Staines, Staines & Eppling, Metairie, LA, for Credit General Insurance Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEMMON, District Judge.

### I. BACKGROUND

The United States Corps of Engineers engaged B & B Dredging, Inc. (B & B) and the M/V DREDGE BATON ROUGE to dredge a waterway along the Intracoastal Canal near Panama City, Florida. The contract between B & B and the Corps required B & B to sweep silt from the Intracoastal waterway and to place it in a spoil area on a nearby island. Milfred J. Nunez was employed by B & B as a seaman[1] and a member of the crew of the M/V DREDGE BATON ROUGE. Nunez was the foreman assigned to the dredge dump and was responsible for monitoring the dredge spoil site where silt expelled by the dredge was piled.

B & B entered into a contract with A & A Towing, L.L.C. to furnish a track hoe and an operator to B & B. A & A leased a track hoe from Beard Equipment Rental; and Arthur Prestenbach, Jr., the president of A & A, sent his father, Arthur Prestenbach, Sr., to operate the leased track hoe. The track hoe, which was positioned on land, was used to lift and transfer pipe to the banks of the waterway.

On September 4, 1997, Nunez was injured when the track hoe struck him on his left shoulder. Nunez filed a complaint against B & B Dredging, Inc. and Clarendon America Insurance Company, B & B's insurer, asserting claims for negligence under the Jones Act, 46 U.S.C.App. § 688 *et seq.*, and unseaworthiness and maintenance and cure under the general maritime law, and against A & A Towing,

L.L.C., Arthur Prestenbach, Sr., and Credit General Insurance Company, A & A's insurer, asserting claims based on Prestenbach, Sr.'s negligence.[2] A & A settled before trial for $92,500. The case against B & B; Clarendon; and Prestenbach, Sr.[3] proceeded to trial without a jury. The following constitutes the court's findings of fact and conclusions of law.

### II. DISCUSSION

#### A. Borrowed employee

■ Nunez contends that B & B is liable for his injuries under a theory of *respondeat superior* because the injuries were caused by the negligence of B & B's borrowed employee, Prestenbach, Sr. Before addressing the allegation of negligence, the court must determine the preliminary question whether Prestenbach, Sr. is the borrowed employee of B & B.

The following evidence was presented at trial. Roland Nunez,[4] the supervisor for B & B, testified that it was his responsibility to bid and to run every aspect of the B & B jobs. The contract between A & A and B & B provided for the lease of one John Deere Excavator with a 2¼ yard bucket and an operator to move pipe and to raise the levees in order to keep the water from overflowing and going back into the canal. Roland stated that, although he had qualified people to operate the track hoe, Prestenbach, Sr. "came with the machine." The cost of the track hoe with an operator was $950 per day for a term of two months. A & A billed B & B the lump sum and paid Prestenbach, Sr. for the hours that he worked.

The allegation that Roland directed where Prestenbach, Sr. would work, what

1. The court has previously determined that Nunez was a seaman, in the course and scope of his employment with B & B, at the time of his injury.

2. Charlotte Nunez filed a claim for loss of consortium, but abandoned the claim against B & B at the trial because the Jones Act does not recognize a claim for loss of consortium.

3. The claims are against Prestenbach, Sr. personally and to the extent that he is a borrowed employee of B & B.

4. Roland Nunez is Milford Nunez's brother.

work he was to perform, and how it was to be performed was supported by the testimony of Brian Guillot, a deck hand who worked in the excavated pits, who stated that Prestenbach, Sr. received his orders concerning the operation of the excavator from B & B. Prestenbach, Sr. ate with the crew, stayed with the crew at a local hotel, and traveled with the crew to the job site; he was expected to remain until the job ended.

A & A never had a supervisor on the job. Prestenbach, Jr. stated in his corporate deposition that A & A worked as directed by B & B and that he spoke with Prestenbach, Sr. only once or twice during the two-week period that he was on the job.[5]

Prestenbach, Sr. spoke to his son about the accident approximately one week after it happened. Prestenbach, Jr. did not prepare an accident report because, according to his testimony, he did not consider his father to be an employee of A & A. Prestenbach, Jr.'s only visit to the job site was to inquire why Prestenbach, Sr. had been fired. After Prestenbach, Sr. was terminated, employees of B & B operated the leased track hoe.

"[A] third person who borrows a worker may become his employer if the borrowing employer assumes enough control over the worker." *Guidry v. South Louisiana Contractors, Inc.,* 614 F.2d 447, 452 (5th Cir.1980). The borrowed employee doctrine recognizes that

> [o]ne may be in the general service of another and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with

all the legal consequences of the new relation.

*Standard Oil Co. v. Anderson,* 212 U.S. 215, 29 S.Ct. 252, 253, 53 L.Ed. 480 (1909).

In *Ruiz v. Shell Oil Co.,* 413 F.2d 310 (5th Cir.1969), the Court of Appeals enunciated nine factors to determine whether the borrowed employee doctrine applies:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

*Capps v. N.L. Baroid–NL Indus., Inc.,* 784 F.2d 615, 616–17 (5th Cir.1986) (citing *Ruiz,* 413 F.2d at 312–13). The courts place the most emphasis on the first factor, control over the employee; however, no single factor or combination is determinative. *See Ruiz,* 413 F.2d at 312.[6]

Under the first and second *Ruiz* factors, B & B clearly had control over Prestenbach, Sr. in performing his work for B & B. A & A gave no instructions except to

---

**5.** The parties stipulated to the admission of Prestenbach, Jr.'s testimony in the corporate deposition.

**6.** In *Gaudet v. Exxon Corp.,* 562 F.2d 351, 356 (5th Cir.1977), the court de-emphasized the control factor and stressed the fourth, fifth, sixth, and seventh factors as being more important when the doctrine is used as a defense

to tort liability in the context of a Longshore and Harbor Workers' Compensation Act case. *See Melancon v. Amoco Production Co.,* 834 F.2d 1238, 1245 n. 12 (5th Cir.1988). The court conceded that the control factor was the most important factor in the use of the borrowed employee doctrine in *respondeat superior* cases. *Id.*

send Prestenbach, Sr. to B & B's job site to operate the track hoe. Prestenbach, Sr. performed the work at B & B's work site for the benefit of B & B in fulfilling its contract with the Corps of Engineers. B & B directed all aspects of the project and employed its own safety policies. Moreover, during the period that Prestenbach, Sr. operated the track hoe for B & B, B & B made his hotel arrangements and transported him to and from the job site.

Although the contract between A & A and B & B does not specifically provide under whose control Prestenbach, Sr. was working, the evidence indicates that it was understood by A & A that Prestenbach, Sr. would be taking his instructions from Roland and B & B, in satisfaction of the third factor. Prestenbach, Sr. understood that A & A was in the business of leasing equipment and, at times, providing an operator for the equipment. Further, Prestenbach, Sr. agreed to work for B & B under its direction, indicating his acquiescence in the arrangement, as required by the fourth factor.

The fifth factor focuses on the lending employer's relationship with the employee during the time of the borrowing. Although there is no evidence that A & A intended permanently to terminate its relationship with Prestenbach, Sr., no one from A & A visited the job site during the time of borrowing, and Prestenbach, Sr. and Prestenbach, Jr. spoke only a few times. The fifth factor favors a finding of borrowed employee status. *See Capps*, 784 F.2d at 617.

The equipment was leased by A & A from Beard and furnished to B & B at B & B's job site. The sixth factor appears to be neutral.

The three remaining factors weigh in favor of borrowed employee status. Although the lease agreement with A & A was for a relatively short term of two months, it was expected that Prestenbach, Sr. would be employed to operate the track hoe for the duration of the contract with the Corps of Engineers. Presten-

bach, Sr.'s term was interrupted when B & B exercised its right to terminate his services at its project. This factor weighs in favor of borrowed employee status. *See Brown v. Union Oil Co. of California*, 984 F.2d 674, 678 (5th Cir.1993) (one month is a sufficiently long work period). B & B had the right to fire Prestenbach, Sr. The captain of the dredge did in fact fire him when the dredge was shut down because Prestenbach, Sr. was unable to perform his work of keeping up the levees satisfactorily. B & B's right to terminate Prestenbach, Sr.'s services on this job satisfies the eighth factor, even though it could not terminate his services with A & A. *See Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1246 (5th Cir.1988). The ninth factor weighs in favor of borrowed employee status, even though A & A wrote the check. *See Capps*, 784 F.2d at 618. B & B was obligated under the contract to pay Prestenbach, Sr.'s wages at a rate of $175 per day.

Accordingly, the court concludes that the *Ruiz* factors weigh in favor of the determination that Prestenbach, Sr. was the borrowed employee of B & B. The analysis now turns to the questions whether Nunez was injured as a result of Prestenbach, Sr.'s negligence.

## B. The liability of Prestenbach, Sr.

█ Nunez asserts that he was injured when Prestenbach, Sr. rotated the housing of the track hoe and knocked him 15 to 20 feet into the air. He alleges that his injuries were the result of Prestenbach, Sr.'s negligence.

On the morning of the accident, Nunez was at the dumpsite instructing Guillot to add a pipe connection to prevent the silt from going back into the waterway. Nunez testified that he tried to reach Guillot to assist him, but he started sinking in the mud as he moved toward Guillot. Nunez then climbed on the track hoe and advised Prestenbach, Sr. not to move the rig while he was attempting to walk to the other

side. Nunez recalls that Prestenbach, Sr. acknowledged and said "okay." As Nunez climbed across the back to the left track, the housing of the track hoe rotated. Nunez stated that he did not know why Prestenbach, Sr. moved the machine.[7]

Guillot testified that he saw Nunez speak to Prestenbach, Sr. and watched as the crane swung around and sent Nunez "flying." Guillot stated that Nunez did not signal Prestenbach, Sr. to move the machine and that he did not know why the operator did so.

Guillot agreed that Nunez was hit on his left shoulder and was thrown approximately 15 to 20 feet in the air. Nunez landed on his left side in the silt near Guillot's feet. Guillot tried to help Nunez up, but he did not want to hurt him. Guillot noticed that Nunez's right arm was "giving him trouble."

Roland learned about Nunez's accident when he returned to the hotel in the evening. He affirmed that B & B's safety manager interviewed Guillot and the operator and prepared an accident report. Roland stated that the company rule that the operator could not move the machine while a pipeline was being moved unless directed to do so had been explained to Prestenbach, Sr. at safety meetings.

The evidence supports a finding that Prestenbach, Sr. was negligent in the operation of the track hoe and that Nunez was injured as a result of that negligence. The operator was advised of the safety procedures and was informed that he was to take his instructions from Nunez before moving the track hoe. Although Nunez warned that he was about to make the maneuver and Prestenbach, Sr. acknowledged that he understood, Prestenbach, Sr. caused the housing to move and to strike Nunez, injuring him.

Under the Jones Act, a seaman is obligated "to act with ordinary prudence under the circumstances." *See Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331, 339 (5th Cir.1997) (en banc). "The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard, therefore, [in] a Jones Act negligence action becomes one of the reasonable seaman in like circumstances." *Id.*

The court finds that Nunez acted with ordinary prudence under the circumstances. Nunez advised Prestenbach, Sr. that he was going to climb across the back of the track hoe, and there was no evidence that Nunez was negligent in executing the maneuver.

### C. B & B's liability

■ Moreover, the court finds that B & B is liable for Prestenbach, Sr.'s negligence. The borrowed employee doctrine holds the "proper employer responsible for the torts of his employee" under the theory of *respondeat superior. Gaudet v. Exxon Corp.,* 562 F.2d 351, 355 (5th Cir.1977). Because Prestenbach, Sr. is B & B's borrowed employee, B & B is responsible for Prestenbach Sr.'s negligence under the theory of *respondeat superior.*

### D. A & A's liability

■ Although A & A entered into a settlement agreement with Nunez prior to trial, the court is not relieved of the task of determining whether A & A was legally responsible for Nunez's injuries because B & B may be entitled to a credit for the proportionate liability of the settling defendant.[8] The court considers whether A & A

---

7. Prestenbach, Sr. did not appear to testify at trial. On the morning of the trial, the court issued a warrant instructing the United States Marshal to locate Prestenbach, Sr. and to deliver him to the courtroom to testify. The marshals were unable to locate him, and the warrant was rescinded at the close of the evidence at the request of counsel for both parties.

8. Where the defendants are both vicariously liable for the same act of their joint employee

maintained sufficient control over the borrowed employee to lead to the conclusion that he was also A & A's employee. *See Tyson v. Litwin Corp.*, 826 F.2d 1255, 1258 (3rd Cir.1987).

The court looks to section 227 of the Restatement (Second) of Agency (1958) for guidance.[9] Comments b and c of § 227 address the method used to determine whether Prestenbach, Sr. understood that he remained in the allegiance of A & A when he was operating the track hoe.

> b. Inference that original service continues. In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.

> c. Factors to be considered. Many of the factors ... which determine that a person is a servant are also useful in determining whether the lent servant has become the servant of the borrowing employer. Thus a continuation of the general employment is indicated by the fact that the general employer can properly substitute another servant at any time, that the time of the new employment is short, and that the lent servant has the skill of a specialist.

> A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality, and these may be opposed to the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise, permits his servant and instrumentality to assist another, is more apt to intend to surrender control.

In this case, the evidence does not contradict the inference that Prestenbach Sr.'s original service with A & A continued. A & A was in the business of renting machines and providing an operator for those machines. Prestenbach, Sr. had a special relationship with A & A because he is the father of the owner of A & A. A & A provided the operator and implicitly retained the capacity under the contract to substitute another operator for Prestenbach, Sr. at any time. Further, B & B had the right to direct Prestenbach, Sr. in the specific acts of the job and to discharge him from B & B's employment; however, B & B could not discharge him from A &

---

under the doctrine of *respondeat superior,* they are each liable for 50%. *See United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 1716, 44 L.Ed.2d 251 (1975) (liability "is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault"); *see McDermott, Inc. v. AmClyde,* 511 U.S. 202, 114 S.Ct. 1461, 1465, 128 L.Ed.2d 148 (1994); *see, e.g., Thompson v. New Orleans Public Belt R.R.,* 373 So.2d 1312, 1318 (La.Ct.App.1979) (when damages

are apportioned between two employers, each should be responsible for its virile share; apportioning 50% fault to each employer).

9. Section 227 sets forth the borrowed servant doctrine:

> A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others.

A's employment.[10] Accordingly, the court finds that Prestenbach, Sr. did not abandon his relationship with A & A, worked in furtherance of the business of both A & A and B & B, and he was the employee of both B & B and A & A.[11]

In Jones Act and general maritime cases, joint tortfeasors are jointly and severally liable. *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1116 (5th Cir.1995) (en banc); *Joia v. Jo–Ja Service Corp.*, 817 F.2d 908, 915 (1st Cir.1987). A Jones Act defendant can be held jointly liable with a defendant whose negligence arises under state or general maritime law. *See Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1431 (5th Cir.1988). Accordingly, A & A, B & B, and Prestenbach, Sr. are jointly and severally liable.

In cases such as this in which there has been a settlement, the nonsettling defendant is entitled to a credit for that settlement. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 114 S.Ct. 1461, 1465, 128 L.Ed.2d 148 (1994). The credit to the nonsettling defendant is determined by the proportionate share of liability of each defendant. *Id.* at 1470–72. Because A & A and B & B are both vicariously liable as employers of Prestenbach, Sr., B & B is credited with A & A's 50% share of liability.[12]

## E. The extent of the injury caused by the accident

Nunez was treated at a clinic[13] in DeFuniak Springs, Florida, the day following the accident, where the clinic physician gave him a sling for his left arm and sent him back to work on light duty. Nunez could not return to his position as dump foreman, and Roland placed him on light duty transporting the crew to and from the job and checking the site. Nunez was never able to return to regular duty. He accompanied the crew to another job in the Mississippi River above Baton Rouge and operated a survey boat or transported materials until his employment with B & B terminated in February 1998.

Nunez then went to work at Gulf South Marble driving a delivery truck. The people at the various delivery sites unloaded the truck for him because he was unable to lift the boxes of tile. Following the advice of his physician, Nunez quit the job after two months because it was too strenuous.

On March 16, 1998, when Nunez began dropping items that he was holding, he saw Dr. Essam Elmorshiddy,[14] an orthopaedist, for an evaluation. The medical records indicate that Nunez was complaining of pain in his neck and pain referred to his left shoulder and left elbow as a result of being hit on his left side by the back of a swinging track hoe six months earlier. Nunez told Dr. Elmorshiddy that he initially thought his neck and shoulder pain would improve with time, but that it had not. Nunez did not have a history of neck, shoulder, or elbow problems prior to the accident.

The examination of Nunez's neck showed spasms, tenderness, and limited

---

**10.** The court does not find it important that A & A leased the track hoe from another vender because A & A assumed responsibility for the track hoe.

**11.** The rule in several jurisdictions is that both the general and special employer may be held liable for the employee's tort. *See Morgan v. ABC Manufacturer*, 710 So.2d 1077, 1082 (La.1998); *see also LeJeune v. Allstate Ins. Co.*, 365 So.2d 471, 482 n. 14 (La.1978) (listing jurisdictions that have held that the general and special employer may be held solidarily liable for the employee's tort), *Bright v. Cargill, Inc.*, 251 Kan. 387, 837 P.2d

348, 362–63 (1992); Restatement (Second) of Agency § 227 notes (court citations July 1992 through June 1999).

**12.** The parties do not raise the issue whether A & A and B & B could seek indemnity or contribution from Prestenbach, Sr.

**13.** The clinic has since closed, and Nunez has been unable to obtain his medical records.

**14.** Dr. Elmorshiddy did not testify because he was killed in an automobile accident in November 1998.

motion. The elbow showed tenderness, weakness of the grip of the left hand, and diminished sensation of the thumb, index, and middle finger. Dr. Elmorshiddy diagnosed a strain of the cervical spine, aggravation of degenerative arthritis, contusion of the right shoulder, post-traumatic subacromial bursitis, and post-traumatic tendinitis of extensor origin of the left elbow.

The doctor ordered a MRI of the cervical spine and an EMG. A MRI of the cervical spine showed disc herniation at C6–7 producing significant encroachment on the canal and cervical cord and significant encroachment upon the dural sac at C5–6. The EMG showed left median neuropathy at the left wrist. Dr. Elmorshiddy chose a conservative treatment of massage, heat, and medication. The tender areas of the neck and shoulder were injected with a local steroid and xylocaine, and Nunez was given a brace for his wrist. Dr. Elmorshiddy discussed the feasibility of surgery and immobilized Nunez in a "Miami J" cervical collar.

On July 2, 1998, Nunez's symptoms persisted, and he began experiencing stiffness and pain in the back and in the right hip and leg. An examination of the back showed muscle spasms, tenderness, and limited painful motion. A MRI of the lumbar spine showed osteophyte/disc complex causing a mild degree of central stenosis at L4–5, and a disc bulge.

On August 8, 1998, Nunez underwent surgery for left carpal tunnel syndrome. Dr. Elmorshiddy continued to treat Nunez conservatively for the pain related to his neck and back.

Because of Dr. Elmorshiddy's untimely death, on December 15, 1998, Nunez's care was assumed by Dr. George Murphy, an orthopaedist. At trial, Dr. Murphy testified that Nunez has multi-level disc disease at C5–6 and C6–7. He stated that the complaints of pain reported by Nunez correlate to the radiographic evidence and that there is nothing inconsistent with the presence of pain on the left side. There is a large herniated disc at C6–7 that contacts the spinal cord and poses a risk of developing a neurological problem if there should be further injury. According to Dr. Murphy, spinal cord compression can cause symptoms on the left or right side and could cause referred pain to Nunez's left shoulder and arm. In light of the current cord compression, Nunez may be a candidate for cervical spine surgery in the future. At C5–6 there are bony changes that predate the accident. Dr. Murphy opined that Nunez's condition was asymtomatic prior to the accident and that the trauma of the accident could have caused it to become symptomatic.

Dr. Murphy assigned a 10 to 15% whole body impairment as a result of the condition of the cervical spine and a 10 to 20% impairment rating due to the problems at the left upper extremity. He stated that, based on the injury to his neck alone, Nunez would have been restricted after the accident. Dr. Murphy did not view Nunez as a malingerer and reiterated that the objective evidence supported his complaints.

The defendant presented the testimony of Dr. Melvin Parnell, who conducted a ten-minute examination of Nunez on January 12, 1999. The examination showed cervical spine motion at approximately 50% of normal with discomfort at the extremes of motion. Although Dr. Parnell found discomfort at the base of the neck, he stated that there was no radiation of the discomfort into either upper extremity. There was an impaired range of motion of the left shoulder, but no evidence of instability.

Dr. Parnell also reviewed copies of the MRI scans of the cervical and lumbar spine. Dr. Parnell stated that there was evidence of a disc herniation at C6–7 on the right side of the cervical spine. There was also evidence of compression of the spinal cord at C5–6 on the right side due to a bone spur. The MRI of the lumbar spine showed evidence of a bulging disc at L4–5 to the right. Based on the review of

the radiographic studies, Dr. Parnell did not feel that there was evidence of a clinically significant disc herniation in either the cervical or the lumbar spine.

Dr. Parnell disagreed with the radiologist's statement that there was a significant encroachment of the cord and opined that Nunez sustained cervical and lumbar strains with no significant permanent impairment to either the neck or the lower back. He stated that muscle spasms, limitation of motion, and pain were consistent with chronic cervical strain.

■ The court finds the testimony of Dr. Murphy credible and credits the records and reports of Dr. Elmorshiddy and the radiologists concerning the extent of Nunez's injury. Further, the court finds that Nunez's present injury as identified by these physicians was caused by the accident involving the track hoe in September 1997. Even if Nunez's degenerative condition was present before the accident, the trauma of being struck and thrown 15 to 20 feet caused his condition to become symptomatic.

## F. Vocational Expert

On December 7, 1999, Bobby Roberts, a vocational evaluation specialist, evaluated Nunez to determine his levels of vocational functioning and to predict future employability. In addition to administering a variety of tests, Roberts reviewed radiological reports from Chalmette Medical Center and the medical reports of Dr. Elmorshiddy and Dr. Murphy.

Nunez was born on September 21, 1939, and completed the 8th grade at St. Bernard High School. His test results revealed a borderline range of classification overall with an extreme deficiency in math skills and an elevated range for situational personality factors. Nunez's overall general ability for performance characteristics was consistent with a history of semiskilled work activities.

At the time of testing, Nunez had difficulty with sustained activities. He could sit for 15 minutes or less, he could stand for 10 minutes or less, and sustained activities caused increased symptoms in the left shoulder and left upper extremity with marked decreased capability. Roberts clarified that there were activities that Nunez could perform, such as removing his Christmas tree lights or dragging his tree to the trash; however, Nunez could perform such activities only for a short duration and could not sustain the activities over time.

Roberts testified that he had not detected signs of malingering or exaggeration and that the computerized test results did not identify any inconsistencies. Roberts disagreed with the treating physician that Nunez was only restricted to sedentary work because Nunez lacked the academic skills required to perform even sedentary work, he could not use both upper extremities in the performance of sedentary work, and he could not flex his neck forward.

Roberts recommended continued medical evaluation and treatment of the cervical symptoms; further medical evaluation of the upper extremity symptoms, which showed decreased functional ability; further medical evaluation of low back symptoms, which extended down the left lower extremity to the ankle; a referral to a clinical psychologist to evaluate the elevated personality factors; and a referral to an ophthalmologist to evaluate his vision deficits. In view of Nunez's age, poor educational levels of functioning, and limited functional capabilities, Roberts concluded that it was unlikely that he could return to the gainful labor market.[15]

In lieu of testimony, the defendant presented evidence of a written report of a vocational rehabilitation evaluation conducted by Judith Lide. Lide met with Nu-

---

15. Dr. Parnell testified on cross-examination that he had not seen the results of Mr. Roberts' tests; however, the tests may have influ-

enced his opinion if he determined that they were valid.

nez on January 5, 2000; administered the Wide Range Achievement Test and the Vocational Preference Inventory; and reviewed Nunez's deposition, his social security and employment records, Roberts' vocational report, and the medical records. After considering the restrictions outlined by Dr. Elmorshiddy, Lide concluded that Nunez could perform selected assembling and packaging tasks, work as a security guard, perform small equipment repairs, and obtain certain driving positions that did not require a commercial driver's license.

After carefully considering the testimony, medical reports and records and the vocational experts' reports, the court finds that Nunez does not have the functional ability to perform gainful work activity due to his age, academic level of functioning, and limited sustained physical capabilities.

## G. Damages

Nunez seeks special damages for past medical expenses, future medical expenses, past lost earnings, future lost earnings, general damages, and prejudgment interest on past losses under the general maritime law.

 IT IS ORDERED that there be judgment in favor of Milfred J. Nunez as follows:

| | |
|---|---|
| Past medical: | $ 13,873.83 |
| Future medical: | $ 23,814.00 |
| Past lost earnings: | $ 69,905.00 |
| Future lost earnings: | $143,977.00 |
| General damages: | $100,000.00. |

The court declines to award prejudgment interest on past losses because the Nunez proceeded against B & B under the Jones Act, and prejudgment interest is not an element of damages thereunder. *See Simeon v. T. Smith & Son. Inc.*, 852 F.2d 1421 (5th Cir.1988). Because Prestenbach, Sr. was the employee of both A & A, the settling defendant, and B & B, B & B is entitled to a credit of 50%.